IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCESCA VIOLA | ) | Case No. 20-1439 |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| JOSHUA BENTON | ) | |
| | ) | |
| And | ) | |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | |
| HARVARD COLLEGE (HARVARD | ) | |
| CORPORATION) | ) | |
| | | |
| *Defendants* | | |

## COMPLAINT - CIVIL ACTION

Plaintiff, Francesca Viola ("Viola") by and through undersigned counsel, hereby states as follows in support of her Complaint against Defendants Joshua Benton ("Defendant Benton") and President and Fellows of Harvard College ("Defendant Harvard") (Collectively, "Defendants").

## Parties

1.      Viola is an award winning, respected journalist and journalism professor whose career spans more than twenty years. She is an individual and resident of Fort Washington, Pennsylvania, in the County of Montgomery, and has been at all relevant times referenced herein.

2.      Defendant Benton, an individual, is a journalist and the founder and director of the Nieman Journalism Lab ("Nieman Lab") which operates a website located at https://www.niemanlab.org and is owned by the Nieman Foundation for Journalism at Harvard University. The Nieman Lab holds itself out as "an attempt to help journalism figure out its future in an Internet age." https://www.niemanlab.org/about/.   At all times relevant herein, Defendant

1

Benton was an employee of Defendant Harvard and was acting within the scope of his employment. Upon information and belief, Defendant Benton is a resident of Massachusetts and has been at all relevant times referenced herein.

3.      Defendant Harvard is a private university based in Cambridge, Massachusetts and has been at all relevant times referenced herein.

## Venue and Jurisdiction

4.      This Court possesses federal diversity under 28 U.S.C. § 1332 as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

5.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because Defendant Benton purposely directed his tortious activities against Viola toward the State of Pennsylvania and caused harm to her in this venue. *Dudnikov v. Chalk & Vermillion Fine Arts*, 514 F.3d 1063, 2008 U.S. App LEXIS 1870 (2008).

## Factual Allegations

6.      Prior to initiating this litigation, the Parties agreed to an extension of the statute of limitations of Viola's claims through a tolling agreement which was still in effect at the time this litigation was initiated.

### A.      Viola's Background & Employment History with Temple University

7.      Beginning in 2004, Viola worked as a journalism professor in the Klein College of Media and Communication at Temple University ("Temple").

8.      Prior to incidents that gave rise to this lawsuit, Viola enjoyed a successful career with Temple and had cultivated a stellar reputation in the Temple community which included earning a faculty merit award for exceptional performance on April 23, 2018.

2

9.     Viola worked under a teaching contract that was renewed periodically throughout her employment without issue.

10.     The criteria Temple used to evaluate Viola's job performance as a professor did not include her personal political opinions or beliefs. As an employee, Viola was not subject to any restrictions concerning her use of online platforms outside of the workplace to comment on political matters or to express her opinions under her own name or through a pseudonym.

11.     Ms. Viola never received feedback from her students, colleagues or employer that she performed her professional duties in a manner that showed favoritism or disparate treatment toward any ethnic, racial, religious or political group.

**B.     Defendant Benton's Background & Employment at Harvard University's Nieman Lab**

12.     According to his description on the Nieman Lab website, Defendant Benton is the founder and "director of the Nieman Journalism Lab." His journalistic achievements include winning the "Philip Meyer Journalism Award from Investigative Reporters and Editors." At all times relevant herein, Defendant Benton has also maintained a website, joshuabenton.com, which includes a link to his Twitter account and states the following: "**Joshua Benton is a journalist, writer, and editor. By day, and often by night, he is director of the Nieman Journalism Lab at Harvard University**, an effort to help journalism adapt to the Internet age, which he founded in 2008." (Emphasis added). A copy of Benton's descriptions from both websites are attached hereto as **Exhibit A**.

13.     At all times relevant herein, Defendant Benton operated a Twitter account with thousands of followers using the handle, @jbenton which he used to publish tweets daily about topics concerning journalism and frequently retweeting articles with commentary and information from various news platforms, including Nieman Lab.

14.     At all times relevant herein, as an employee of Harvard, Defendant Benton was subject to Harvard's Social Media Policy (attached hereto as **Exhibit B**) which states in part, "**Unless specifically authorized to speak on behalf of Harvard or a University department, school or unit, you must state that the views expressed are your own**. On Twitter, for example, you might consider using a disclaimer in the account profile's "Bio" section: "Tweets are my own and do not reflect the views of my employer."(Emphasis Added).

15.     At all times relevant herein, Defendant Benton's Twitter account description **did not include any disclaimer and stated, "I run @niemanlab at Harvard."** (Emphasis Added). A copy of Defendant Benton's Twitter account description as it appeared on May 4, 2018 is attached hereto as **Exhibit C**.

16.     At all times relevant herein, upon information and belief, Defendant utilized his Twitter account as a part of his job responsibilities to further Harvard's interest of increasing awareness of his role at Nieman Lab, to promote the Nieman Lab brand through discussion of Nieman Lab stories and other news events, and to interact with other journalists and readers on behalf of Nieman Lab as its director and founder.

### C.     Defendant Harvard University Used the Comment Sharing Platform Disqus on Nieman Lab's Website & is Bound By its Terms of Use & Comment Moderation Policies

17.     Nieman Lab uses an online public comment sharing platform called Disqus to allow readers to post comments to articles on the website.

18.     Disqus is an application used by thousands of websites which provides a platform for users to post comments on a website's blog articles by creating an account using a name (the "Display Name") and email address.

19.     Disqus permits users to choose their own Display Name which is visible to the public whenever they post a comment through the platform. Multiple users may choose to use the same Display Name which may be pseudonymous.

20.     Visitors to any website that utilizes the Disqus platform for comments may click on the Display Name associated with any comment to see other Disqus comments associated with that user.

21.     The email addresses of users who comment on websites using Disqus is accessible by the website administrators also known as a moderator ("Moderator"), but it is not accessible by third parties or visible to the general public.

22.     Websites that utilize Disqus as a comment platform are subject to the Basic Rules for Discus-Powered Sites (the "BRDPS"), attached hereto as **Exhibit D**.  The BRDPS state that "user information is for moderation purposes only" and "distribution of personally identifiable information is prohibited." The BRDPS also prohibit "intimidation" of Disqus users.

23.     Additionally, in its support forums, Disqus has addressed the role of moderators (attached hereto as **Exhibit E**) and assured its users that while their email addresses are visible to moderators,  "they cannot use it for any purpose other than moderation" and "contacting you directly is against the Terms of Service and often illegal too."

24.     Websites like Nieman are also subject to the Basic Rules for Disqus (the "BRD") (collectively with the BRDPS, "the Disqus Policies") attached hereto as **Exhibit F** which prohibit "posting personally identifiable information"  and "targeted and systematic harassment of people."

25.     Users of Disqus must agree to the terms of the BRD, when creating an account prior to posting any comments. Viola was aware of the terms of the BRD, agreed to them and relied on them when publishing comments through the Disqus platform.

26.     As a website that uses the Disqus platform, Nieman Lab, and by extension Defendant Harvard and Defendant Benton as, a Moderator, are bound by the BRDPS.

27.     Viola maintained a profile on Disqus under the pseudonymous Display Name "truthseeker" (the "Truthseeker Account"). No publicly identifying information regarding Viola was disclosed through the use of this pseudonym and Viola chose to remain anonymous while using the Truthseeker Account.

### D.     Defendant Harvard's Privacy Policy Browsewrap Agreement

28.     The Nieman Labs website is also bound by Defendant Harvard's privacy policy (the "Harvard Privacy Statement") which has been in effect throughout the relevant time period, and is linked to directly on every page of the Nieman Lab website from a link labeled "Privacy" and located at the following URL: https://www.harvard.edu/privacy-statement. It is attached hereto as **Exhibit G**. The Nieman Labs website does not provide users with any other privacy policy.

29.     The Harvard Privacy Statement is a browsewrap agreement with users which states that "[b]y using this website you are consenting to our collection and use of information in accordance with this privacy policy."

30.     The Harvard Privacy Statement also states, unequivocally, that while user data may be collected, users of the website will "remain anonymous."

31.     Anonymous speech and online privacy are crucial and protected rights of which Defendant Harvard University is well aware and has staunchly advocated and defended publicly over many years. See, e.g. The Harvard Cyberlaw Clinic website for reference: https://bit.ly/2PAo1fc ("Speech, Media Law & First Amendment Practice Areas"); https://bit.ly/2wLtHvR ("Protecting Anonymous Speech Under California's Anti-SLAPP Law");

and   https://bit.ly/2wMrwZ7 ("Citizen Media Law Project and Cyberlaw Clinic Lead Amicus Effort Promoting Rights of Anonymous Online Speakers in IL").

32.     Viola read and was aware of the Harvard Privacy Statement and relied on its promise of anonymity when using the Nieman Lab website and commenting on articles.

33.     Viola's reliance was reasonable and expected under the terms of the Harvard Privacy Statement and Disqus's BRDPS which she understood were binding for use of the Nieman Lab website.

34.     At no time did Viola consent to the use of her email address for the purpose of discovering other identifying information about her.

### E.     Defendant Benton's Doxxing Attack against Viola

35.     On May 4, 2018, Nieman Lab published an article ("the Article") to its website titled, "People who are delusional, dogmatic, or religious fundamentalists are more likely to believe fake news."  The article, attached hereto as **Exhibit H** can be found at the following URL: https://www.niemanlab.org/2018/05/people-who-are-delusional-dogmatic-or-religious-fundamentalists-are-more-likely-to-believe-fake-news/.

36.     The same day, Viola anonymously posted a comment to the Article using the Truthseeker Account. Viola's comment was critical of both the Article itself and Nieman Lab. It was posted in response to another critical comment published under the Display Name, "Alexander Best." The Alexander Best comment is attached hereto as **Exhibit I** and stated the following:

> This is embarrassing journalism. Your headline suggests people who have religious views that are perceived as "fundamentalist" are equivalent to people who are "delusional." Your caveats on causation and correlation as the fine print does not elevate the sense that this article is just another illustration of "fake" news. And that is what is so sad about the entire topic. "Serious" Media have chosen the same methodologies of the people they disdain. I expect it from

7

> soap opera CNN but Nieman? If you are a lab for the future of
> journalism, that is really worrying. I appreciate the daily briefings.
> But this undermines the credibility of what in the inevitable speed
> of life and glut of data, is often just a fleeting headline. This makes
> me more likely to delete or unsubscribe. It is not just the poor quality
> of the journalism it is what it say about the Editor of this section.
> Eye, ball, off.

37.     Viola's Truthseeker Account comment, is attached hereto as **Exhibit J** and stated

the following:

> I am a journalism professor at a major east coast university and I
> completely agree with you.  I follow Nieman but this is an article
> designed to insinuate that 1) Trump supporters who happen to be
> religious are delusional 2) conservative media that don't tout the
> democrat party talking points are disseminating 'fake news.' I will
> no longer use Nieman as a source.

38.     In his capacity as Director of Nieman Lab, Defendant Benton was a Moderator and

had administrative access to view Viola's email address associated with the Disqus comment

posted to the Article.  Under the Disqus Policies, Defendant Benton's access to Viola's email

address was supposed to be only for the purpose of moderation only, not for any journalistic

purpose or reason.

39.     Defendant Benton read the "Truthseeker" critical comment on the Nieman Lab

website, and improperly used the administrative access granted by his employment as the Nieman

Lab Director to view the email address associated with the Truthseeker Account. Defendant

Benton's actions to view the email address were taken during the course and scope of his

employment for journalistic purposes to further the interests and purposes of his employer.

Defendant's actions harmed Viola and violated her privacy and right to express her opinions

anonymously under the First Amendment.

40.     After viewing the email address, Defendant Benton then used this information to seek out additional details to discover Viola's true identity and the identity of her employer and professional colleagues, including her Dean. Defendant Benton's actions to use the administrative access to Viola's email address granted by Defendant Harvard to discover Viola's true identity and the identity of her employer and professional colleagues were taken during the course and scope of his employment as a journalist to further the purposes of his employer.

41.     By abusing the administrative access granted by his employer to view Viola's email address, Defendant Benton was also able to identify previous anonymous comments posted using the same Truthseeker Account on other Disqus powered websites. Defendant Benton's actions to use the administrative access to Viola's email address granted by Defendant Harvard to identify previous comments were taken during the course and scope of his employment as a journalist to further the purposes of his employer. Defendants' actions harmed Viola and violated her privacy and right to express her opinions anonymously under the First Amendment.

42.     Defendants' actions to investigate Ms. Viola's private concerns without authority or her consent, violated Ms. Viola's right to keep her name and employer separate from the anonymous Truthseeker account which caused her great mental and emotional distress.

43.     Defendant Benton did not contact Viola to confirm that she was the author of the comments published by the "Truthseeker" account, to ask if the comments reflected her actual beliefs about the subject matters referenced or to provide her with an opportunity to respond. Defendant acted with reckless disregard for whether the information he gathered was truthful and accurate and did so intentionally.

44.     In retaliation for the Truthseeker Account comment published to Nieman Lab, Defendant Benton sought to exact revenge and inflict harm on Viola personally and professionally

by publishing a barrage of harassing and disparaging statements about her in a series of Tweets to his Twitter account (the "Twitter Statements") which revealed her identity and associated her with the Truthseeker Account. The Twitter Statements are attached hereto as **Exhibit K**. Defendant Benton's actions to publish the Twitter Statements were done on behalf of Nieman Lab, for journalistic purposes, and were taken during the course and scope of his employment as a journalist to further the purposes of his employer.

45.     Upon information and belief, Defendant Benton's animus toward Viola was motivated by his disdain for, and disagreement with, right leaning political views, such as those expressed by the Truthseeker Account and his desire to see her, harassed publicly by hundreds of people, fired from her job, and have her censured.

46.     Neither Viola's identity in association with the Truthseeker Account nor her identity as it related to her comment to the Article was of legitimate public interest or newsworthy. Viola's public opinions are not taken into account or used as a criterion to evaluate her professional competence or evaluate her job performance at Temple University.

47.     Defendant Benton willfully and intentionally named Viola in his Twitter Statements to criticize, embarrass, and otherwise harass Viola repeatedly.

48.     The Twitter Statements also included mentions directed to the usernames of other Twitter users. Twitter mentions are a form of direct public communication with other Twitter users and generate a notification from Twitter to the recipient that their username has been included within a tweet.

49.     Defendant Benton directed the mentions within the Twitter Statements to the Twitter Accounts of Viola's employer, Temple University, the Dean of Temple University's Klein

College of Media and Communication, David Boardman, and two Temple University journalism

professors, Aron Pilhofer and Brian Creech.

50.  Defendant Benton directed the mentions within the Twitter Statements to Ms.

Viola's employer and colleagues with the intent of injuring her business relationships and

damaging her prospects for continued employment.

51.  The Twitter Statements included the following:

a.  "I think that this attitude — permanently rejecting a news source because it accurately reports something you don't like — is exactly what you want in a journalism professor, yes? Also, spell our name right, Francesca Viola of Temple University."

b.  "For what it's worth, Temple journalism professor Francesca Viola also believes Seth Rich was murdered by Hillary Clinton and the DNC";

c.  "She also believes @DRUDGE_REPORT has sold out to the libs";

d.  "She's also not a particular fan of Muslims, it seems";

e.  "She seems to lack a basic understanding of the First Amendment and is upset that @PhillyInquirer doesn't 'give readers a chance to express any anti-Muslim or anti-immigrant sentiments' or comment on 'crimes involving African Americans";

f.  "Oh, she also believes that Trump actually won the *real* popular vote, which was warped by 'some illegal votes cast in California"; and

g.  Basically, Francesca Viola of @TempleUniv is pretty much exactly what you want in a journalism professor.  Cc: @dlboardman @pilhofer @brcreech.

52.  One of the comments attributed to Viola in the Twitter Statements was purportedly

published under the pseudonym "truthseeker" to The Gateway Pundit article titled, "Muslims Take

Over Street- Start Praying in Front of Trump Tower New York for Ramada…" (the "Muslim

Comment").  The Muslim Comment stated, "Scum. Deport them. They hate us. Get rid of them."

53.     Viola specifically denies publishing this comment and it is not consistent with her public or private views of Muslims. Defendant's publications falsely attributing the Muslim comment to Viola is false and constitutes defamation per se.

54.     Additionally, in order to harass Viola and harm her reputation, Defendant Benton selectively published the Twitter Statements in a manner which created the false impression that she is a racist, Islamophobic, and not competent to perform her job.

55.     According to Merriam-Webster.com, this practice of publicly identify[ing] or publish[ing] private information about (someone) especially as a form of punishment or revenge" is defined as "doxxing."

56.     Defendant Benton's efforts to dox Viola were a violation of the Harvard University Privacy Statement, the BRD and the BRDPS.

57.     Defendant Benton's Twitter Statements were published to his thousands of Twitter followers and drew numerous comments, including from other journalists, many of which were critical of his doxxing of Viola.

58.     Upon information and belief, after the Twitter Statements were published, Defendant Benton met with his employer to discuss his actions concerning Viola. During that meeting, Harvard acknowledged that he had been acting in the course and scope of his employment to investigate and publish what he believed was a news story. However, his actions did not comply with Nieman's Journalistic standards. Accordingly, Defendant Harvard along with Defendant Benton, jointly crafted a statement of public apology for Defendant Benton to publish.

59.     Upon information and belief, no further action was taken by Defendant Harvard to discipline Defendant Benton or disavow his unlawful acts against Viola. Defendant Harvard

ratified Defendant Benton's behavior as being in the course and scope of his employment and in the interests of his employer.

60.    Defendant Benton published the apology drafted by both him and Defendant Harvard without any retraction on Twitter, attached hereto as **Exhibit L**, on May 9, 2018 which stated the following:

> In a series of tweets on Friday, May 4, I wrote about an anonymous commenter to a Nieman Lab story. I identified her and her place of work and shared comments posted from the same account on other websites. By revealing such details without making an effort to contact her and seek confirmation and explanation, and otherwise adhere to rigorous reporting methods, the tweets did not meet Nieman's journalistic standards. I apologize and regret my error in judgment.

61.    Despite his acknowledgment that his actions to doxx Viola were "an error in judgment," Defendant Benton did not remove or retract the Twitter Statements and they remain online and accessible to anyone.

62.    Defendant Benton's doxxing of Viola also drew immediate media attention which generated numerous articles about Viola that appeared in print and online as well as broadcast news coverage.

63.    Viola immediately became a social pariah at Temple and within her community. Several of her colleagues demanded that she be fired and published an editorial critical of Viola in the Temple University School newspaper.  Viola was also ostracized during faculty meetings and on campus.

64.    Over the course of several days and weeks, Viola was also bombarded by dozens of harassing and disturbing emails, phone calls, and messages. Both from news media and members of the public. The harassment and intrusive effect into Viola's personal life and day to

day activities was so severe and over whelming, she received calls from the Temple Campus Police, her Dean, and employer, to inquire about her safety and well-being.

65.     As a result, Viola lost her job at Temple and suffered extreme humiliation, fear for her personal safety, a loss of her hard-earned reputation, and severe emotional distress for which she has sought counseling.

## Count I: Invasion of Privacy-Publication of Private Facts

66.     Viola realleges and reavers the Preceding Paragraphs as if fully rewritten and restated herein.

67.     Pursuant to the BRDPS, the BRD, as well as the Privacy Statement maintained by Defendant Harvard on its own website, Viola had a reasonable expectation that her identity would remain anonymous while posting a comment to the Article using a pseudonymous Discus account.

68.     Prior to Defendant Benton's doxxing of Viola, her association with the Truthseeker Account had not been made public.

69.     Defendant Benton intentionally abused his administrative access to Viola's email address to discover the private fact of her true identity in association with the Truthseeker Account.

70.     Defendant Benton proceeded to take this wrongly obtained personal information and publish the Twitter Statements online using his Twitter profile.

71.     Defendant Benton did so to humiliate, harass, and cause harm to Viola.

72.     The subject of the comments published by the Truthseeker Account was a matter of private opinion and was not a matter of public concern.

73.     The posting of her private identity and information regarding her employment and employer were highly offensive to Viola because she reasonably expected her identity to remain private and her speech was anonymous.

14

74.     Defendant Benton's actions have caused Viola outrage, great mental anguish, humiliation, harm her professional standing and damages damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

75.     Defendant Benton undertook these actions during the course and scope of his employment with Defendant Harvard.

## Count II: Invasion of Privacy-Intrusion upon Seclusion

76.     Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

77.     On or about May 4, 2018, Defendant Benton intentionally, and without authorization from Viola, the Harvard Privacy Statement or the Disqus Policies, invaded the privacy of Viola by abusing his administrative access granted by his employer to view the email address associated with the Truthseeker Account and maliciously investigate to discover Viola's identity.

78.     Viola never consented to Defendant Benton accessing her email account for the purpose of discovering other identifying information about her, her employer or colleagues.

79.     At the time of the intrusion, as the website administrator and Director of Nieman Lab, Defendant Benton was acting within the course and scope of his employment with Defendant Harvard University.

80.     This abuse of administrative access was highly offensive to Viola as she had a reasonable expectation of privacy in posting comments through the Truthseeker Account on Disqus.

81.     The Truthseeker Account created by Viola, and the subsequent comments, were private matters and not of public concern.

82.     In furtherance of the intrusion, Defendant Benton intentionally published the information he accessed about Plaintiff in the barrage of Twitter Statements directed at Viola to repeatedly violate her privacy in order to harass and otherwise humiliate Viola.

83.     As a result of Defendant Benton's harassment, Viola was then subjected to media coverage, disturbing phone calls and emails which further intruded on her privacy and was a form of harassment.

84.     Defendant Benton's extreme actions to intrude on Viola's solitude were outrageous and highly offensive to Plaintiff and were also criticized by others who read the Twitter Statements.

85.     These intrusions by Defendant Benton have caused Viola outrage, great mental anguish, humiliation, harm her professional standing and damages with the exact amount to be proven at trial.

86.     Defendant Benton undertook these actions during the course and scope of his employment with Defendant Harvard.

87.     As a result of the repeated intrusions into her privacy, Viola has suffered great mental anguish, harm and damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

## Count III: Invasion of Privacy-False Light

88.     Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

89.     Through publication of the Twitter Statements to his thousands of followers, Defendant Benton gave widespread publicity to matters concerning Viola that unreasonably place Viola in a false light before the public.

90.     By his own admission, Defendant Benton made no effort to contact Ms. Viola to confirm her association with the comments published on the pseudonymous Truthseeker account, to inquire about her actual beliefs concerning the matters discussed in comments, or to provide her with an opportunity to respond.

91.     Defendant Benton selectively published the Twitter Statements including the Muslim Comment in a manner to give the false impression that Viola is racist, Islamophobic and not competent to perform her job and to this day, the Twitter Statements remain published without retraction.

92.     The false light in which Viola has been placed would be highly offensive to a reasonable person and continues to be highly offensive to Viola because she is not a racist or Islamophobic.

93.      Defendant Benton knew that the Twitter Statements placed Viola in a false light or acted with reckless disregard as to the false impression which they created.

94.     As a result of the false light in which she has been placed, Viola has suffered great mental anguish, harm and damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**Count IV: Libel**

95.     Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

96.     Defendant Benton intentionally published the Muslim Comment as part of the Twitter Statements about Viola on the Internet and attributed the Muslim Comment to Viola as a representation that she believes all Muslims are "scum" and should be deported without confirming that she authored it or that it represented her beliefs about Muslims.

17

97.     The Twitter Statements constitute libel per se because they falsely attribute the Muslim Comment to Viola to portray her as racist and Islamophobic, to  impugn Viola in her trade and profession and for the purpose of damaging Plaintiff's reputation and standing in her community.

98.     In furtherance of his efforts, Defendant Benton not only published the Twitter Statements including the Muslim Comment to his thousands of followers, he maliciously included Twitter mentions to the Twitter accounts of her employer, her school dean, and her colleagues, in order to deter them from associating with her.

99.     Defendant Benton authored and published the Twitter Statements on the Internet without privilege or authorization.

100.     The Twitter Statements were read by visitors of the Internet throughout the State of Pennsylvania and the United States, including but not limited to Viola's employer, her colleagues, her students, and other members of her community.

101.     Viola is informed and believes and, upon that basis, assert that the Twitter Statements were written and published with malice in that those publications were made with knowledge of their falsity or with reckless disregard as to the same.

102.     As a direct and proximate result of Defendant Benton's actions, Viola has suffered significant reputational harm and sustained actual damages including, but not limited to, mental anguish, loss of income, lost productivity, expenses incurred, and loss of intangible assets in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

### Count V: Defamation by Implication

103.    Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

104.    The Twitter Statements constitute defamation by implication as they are intentionally misleading concerning the character and beliefs of Viola and selectively published for the purpose of destroying Viola's reputation and standing in the community by inferring that she is a racist, Islamophobic and not competent to perform her job.

105.    In furtherance of his efforts, Defendant Benton not only published the Twitter Statements to his thousands of followers, he maliciously included Twitter mentions to the Twitter accounts of her employer, her school dean, and her colleagues, in order to deter them from associating with her.

106.    The Twitter Statements constitute libel per se as they are false, defamatory and impugn Viola in her trade and profession.

107.    Defendant Benton authored and published the Twitter Statements on the Internet without privilege or authorization.

108.    The Twitter Statements were read by visitors of the Internet throughout the State of Pennsylvania and the United States, including but not limited to Viola's employer, her colleagues, her students, and other members of her community.

109.    Viola is informed and believes and, upon that basis, assert that the Twitter Statements were written and published with malice in that those publications were made with knowledge of the false impression they would create, or with reckless disregard as to the same.

110.    As a direct and proximate result of Defendant Benton's actions, Viola has suffered significant reputational harm and sustained actual damages including, but not limited to, mental anguish, loss of income, lost productivity, expenses incurred, and loss of intangible assets in an

amount exceeding Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

## Count VI: Breach of Contract

111.    Viola realleges and reavers the preceding Paragraphs as if fully rewritten and restated herein.

112.    On May 4, 2018, and at all times material herein, the website niemanlab.org was governed by the Privacy Statement maintained by Defendant Harvard on its main website.

113.    The Privacy Statement informs users that by use of the Nieman Lab website they are consenting to Harvard's collection and use of information in accordance with the Privacy Statement and assures users that while data may be collected by the website and potential third parties, the user's identity will remain anonymous.

114.    The Privacy Statement also assures users that the data collected will not be shared without the user's permission.

115.    Nieman Lab utilized the third party Disqus to administer and monitor the comments section on niemanlab.org and was bound by the BRDPS which state that user information is for moderation purposes only and prohibit the distribution of personal identifiable information and the intimidation of users of Disqus services.

116.    Users of Disqus agree to the BRD prior to posting any comments and pursuant to the BRD, the distribution of personal identifiable information and targeted harassment is prohibited.

117.    Viola agreed to the terms of and reasonably relied upon the assurances of the Harvard Privacy Policy and the Disqus Policies when accessing and commenting on the website.

118.    Defendant Benton breached the contracts created by both the Harvard Privacy Policy and the Disqus policies by abusing his access as administrator to invade Viola's privacy and violate her right to anonymity by publishing her identity and identifying information about her employer and colleagues on his Twitter account and targeting harassment toward her.

119.    At all times Defendant Benton was acting within the course and scope of his employment with Defendant Harvard.

120.    As a result of Defendants' breach of these contracts, Viola has suffered loss of income, lost productivity, expenses incurred, and loss of intangible assets in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

## Count VII: Promissory Estoppel

121.    Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

122.    By posting the promise that a user's identity will be kept anonymous while users are accessing their website, Defendant Harvard created in users a reasonable reliance of anonymity to promote the use of its website.

123.    Viola relied, to her detriment, upon that promise of anonymity and accessed the website and comments section under a pseudonym.

124.    Viola's reliance was reasonable and foreseeable.

125.    Defendant Benton intentionally breached this promise by posting Viola's personal information in the Twitter Statements.

126.    Defendant Benton was acting within the course and scope of his employment with Defendant Harvard at the time he breached this promise.

127.    As a direct and proximate result of this broken promise, Viola has suffered damages in an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

## Count VIII: Intentional Infliction of Emotional Distress

128.     Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

129.    Defendant Benton maliciously published the Twitter Statements to his thousands of Twitter followers for the purpose of intimidating and harassing Viola, disrupting her relationship with her employer, and destroying her reputation and standing in the community because he disagreed with viewpoints she expressed anonymously online.

130.    Defendant Benton's actions were undertaken with the intent to cause, or in disregard of a substantial probability of causing severe emotional distress to Viola.

131.    It is highly foreseeable that a causal connection would exist between the deliberate and malicious targeted harassment that Defendant directed toward Viola and the resulting injury to Viola of severe emotional distress.

132.    As a direct and proximate result of Defendant Benton's intentional infliction of emotional distress, Viola has suffered physical and mental harm and other damages in an amount exceeding Seventy Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

## Count IX: Tortious Interference with Contractual Relations

133.    Viola realleges and reavers the preceding paragraphs as if fully rewritten and restated herein.

134.   Viola had an existing contractual relationship with her employer, Temple University and had a reasonable expectation of a future professional relationship with Temple based on her excellent job performance and previous renewals of her teaching contract.

135.   Defendant Benton was aware of Viola's existing professional relationship with Temple University.

136.   Defendant Benton intentionally and improperly interfered with Viola's existing relationship with her employer by unlawfully authoring and publishing the Twitter Statements without justification.

137.   As a direct and proximate result of Defendant Benton's unlawful interference, Viola lost her teaching position with Temple University and has suffered damages in i an amount exceeding Seventy-Five Thousand Dollars ($75,000.00) with the exact amount to be proven at trial.

WHEREFORE, Plaintiff Francesca Viola, demands judgment against Defendants, as follows:

(a)   Permanent deletion of the Twitter Statements which name or make reference to Viola.

(b)   A statement posted to Defendant Benton's Twitter account and the Nieman Lab website admitting the breach of the websites' user agreements and a public apology to Viola.

(c)   Actual and/or compensatory damages, and punitive damages where available, in an amount exceeding $75,000.00 with the exact about to be proven at trial;

(d)   Costs of this action, reasonable attorney fees, and pre- and post-litigation interest at the maximum rate provided by law;

(e)   For any and all other relief to which the Court determines Plaintiff is entitled.

Respectfully submitted,

MINC LLC

/s/ Aaron M. Minc
Aaron M. Minc (0086718)*
Dorrian H. Horsey (0081881)*
Minc LLC
200 Park Ave., Suite 200
Orange Village, Ohio 44122
Phone: (216) 373-7706
Fax: (440) 792-5327
E-Mail: aminc@minclaw.com
       dhorsey@minclaw.com
Attorneys for Plaintiff, Francesca Viola
*Admitted *Pro hac vice*


BOCHETTO & LENTZ

/s/ David P. Heim
DAVID P. HEIM
1524 Locus Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
Facsimile: (215) 735-2455
E-Mail: dheim@bochettoandlentz.com

Attorney for Plaintiff, Francesca Viola


**CERTIFICATE OF SERVICE**


      I certify that, on this 12 day of June 2020, a true and correct copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.


/s/ Aaron M. Minc
Aaron M. Minc (0086718)
Dorrian H. Horsey (0081881)
Attorneys for Plaintiff, Francesca Viola