IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANCESCA VIOLA,

               Plaintiff,

     v.

JOSHUA BENTON and PRESIDENT AND
FELLOWS OF HARVARD COLLEGE
(HARVARD CORPORATION),

               Defendants.

Civil Action No. 2:20-cv-01439-NIQA

**MEMORANDUM OF LAW OF
DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE
IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
<u>UNDER FED. R. CIV. P. 12(b)(2) AND 12(b)(6)</u>**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 2

      A.    Prof. Viola's "truthseeker" postings ........................................................ 2

      B.    Benton's Tweets about Viola .................................................................... 6

      C.    Harvard's Contacts with Pennsylvania .................................................... 8

III.  ARGUMENT ...................................................................................................... 8

      A.    The Court Lacks Personal Jurisdiction Over Harvard ............................. 8

            1.    Harvard Is Not Subject to General Jurisdiction in Pennsylvania.............. 9

            2.    Pennsylvania Does Not Have Specific Jurisdiction Over Harvard.......... 11

                  a.    The Court Lacks Specific Jurisdiction Over Harvard On
                        Prof. Viola's Contract-Based Claims ................................. 12

                  b.    The Court Lacks Specific Jurisdiction Over Harvard On
                        Prof. Viola's Tort Claims ................................................. 15

      B.    The Complaint Fails to State a Claim Upon Which Relief May Be Granted ...... 19

            1.    The Complaint Fails to State a Claim for Intrusion Upon Seclusion ...... 21

            2.    The Complaint Fails to State a Claim for Publication of Private
                  Facts ................................................................................................. 24

            3.    Plaintiff's False Light Invasion of Privacy Claims Should Be
                  Dismissed ......................................................................................... 29

            4.    Plaintiff's Defamation and Defamation by Implication Claims
                  Should Be Dismissed ........................................................................ 32

                  a.    Benton's Tweets Are Not Defamatory ............................. 32

                  b.    Benton's Tweets Are Substantially True ......................... 34

                  c.    The Amended Complaint Fails To Plausibly Allege That
                        Benton Acted With Actual Malice.................................... 37

                  d.    The Amended Complaints Fails To Plausibly Allege That
                        Benton Was Negligent .................................................... 37

            5.    The Complaint's Derivative Claims for Intentional Infliction of
                  Emotional Distress and Tortious Interference with Contractual
                  Relations Should Be Dismissed ......................................................... 39

            6.    The Complaint Fails to State a Claim for Breach of Contract................ 43

            7.    The Complaint Fails to State a Claim for Promissory Estoppel ............. 43

IV.   CONCLUSION ................................................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackourey v. Sonellas Custom Tailors*,
   573 F. App'x 208 (3d Cir. 2014) .........................................................................14

*Action Mfg. Co. v. Simon Wrecking Co.*,
   375 F. Supp. 2d 411 (E.D. Pa. 2005) ....................................................................9

*Ambach v. Norwick*,
   441 U.S. 68 (1979)..................................................................................27, 28, 37

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................15, 20

*Basarich et al., v. Rodeghero, et al.*,
   321 N.E.2d 739 (Ill. App. Ct.1974) .....................................................................28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................20

*Bowley v. City of Uniontown Police Dept.*,
   404 F.3d 783 (3d Cir. 2005)...........................................................................23, 24

*Brokerage Concepts v. United States Healthcare*,
   140 F.3d 494 (3d Cir. 1998)..................................................................................40

*Brown v. Board of Educ.*,
   347 U.S. 483 (1954)..............................................................................................27

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)..................................................................................10

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006)....................................................................................1

*Burger v. Blair Medical Associates*,
   964 A.2d 374 (Pa. 2009) ...........................................................................21, 22, 23

*Bustos v. A & E Television Networks*,
   646 F.3d 762 (10th Cir. 2011) ..............................................................................36

*Butler v. Flo-Ron Vending Co.*,
   557 A.2d 730 (Pa. Super. 1989).....................................................................16, 17

## TABLE OF AUTHORITIES

### (continued)

**Page(s)**

*C & K Petroleum Prods., Inc. v. Equibank*,
  839 F.2d 188 (3d Cir. 1988)......................................................................................43, 44, 46

*Campbell v. Fast Retailing USA, Inc.*,
  No. 14-6752,  2015 WL 9302847 (E.D. Pa. Dec. 22, 2015)...................................................11

*Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*,
  795 F.2d 291 (3d Cir. 1986)..................................................................................................40

*Chavez v. Dole Food Co.*,
  836 F.3d 205 (3d Cir. 2016)..................................................................................................10

*Chicarella v. Passant*,
  494 A.2d 1109 (Pa. Super. 1985)..........................................................................................37

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010)..............................................................................................................29

*Cohn v. Cowles Media Co.*,
  501 U.S. 663 (1991)..............................................................................................................46

*Crouse v. Cyclops Indus.*,
  745 A.2d 606 (Pa. 2000).................................................................................................12, 43

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014).....................................................................................................8, 9, 10, 11

*Deklinski v. Marchetti*,
  30 Pa. D. & C.4th 435 (Ct. Com. Pl. Dauphin Cty. 1996)..............................................16, 17

*Doe v. Reed*,
  561 U.S. 186 (2010)..............................................................................................................29

*Dunlap v. Phila. Newspapers, Inc.*,
  448 A. 2d 6 (Pa. Super. 1982)..............................................................................................32

*Edwards v. Wyatt*,
  335 F.3d 261 (3d Cir. 2003)..................................................................................................43

*Elstrom v. Indep. Sch. Dist. No. 270*,
  533 N.W.2d 51 (Minn. Ct. App. 1995)..................................................................................28

*Farber v. Tennant Truck Lines, Inc.*,
  84 F. Supp. 3d 421 (E.D. Pa. 2015) ......................................................................................11

TABLE OF AUTHORITIES

(continued)

Page(s)

*Field v. Omaha Standard, Inc.*,
   582 F. Supp. 323 (E.D. Pa. 1983), *aff'd*, 732 F.2d 145 (3d Cir. 1984), *cert denied*, 105 S. Ct. 113 (1984) ...............................................................................16

*Gabriel v. Giant Eagle, Inc.*,
   124 F. Supp. 3d 550 (W.D. Pa. 2015)...........................................................21, 22

*Garrison v. Louisiana*,
   379 U.S. 64 (1964)...........................................................................................30

*General Elec. Co. v. Deutz AG*,
   270 F.3d 144 (3d Cir. 2001).................................................................................9

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011).............................................................................9, 10, 11, 12

*Graboff v. Colleran Firm*,
   744 F.3d 128 (3d Cir. 2014)........................................................................30, 32

*Hammersmith v. TIG Ins. Co.*,
   480 F.3d 220 (3d Cir. 2007)................................................................................2

*Hard Drive Prods. v. Does 1-48*,
   No. 11 CV 9062, 2012 WL 2196038 (N.D. Ill. June 14, 2012)............................22

*Harris by Harris v. Easton Pub. Co.*,
   483 A.2d 1377 (Pa. Super. 1984).....................................................................21, 24

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989).........................................................................................30

*Helicopteros Nacionales de Colombia v. Hall*,
   466 U.S. 408 (1984)...........................................................................................11

*Hepps v. Phila. Newspapers*,
   485 A.2d 374 (Pa. 1984), *rev'd on other grounds*, 475 U.S. 767 (1986) ...................32, 34, 37

*Hojnowski v. Reading Eagle Co.*,
   No. 06-4407, 2007 Pa. D. & C. Dec. LEXIS 205 (Ct. Com. Pl. Berks Cty.
   June 5, 2007)................................................................................................34, 36

*Houston v. State Bd. of Educ.*,
   No. 1 CA-CV 11-0617, 2013 Ariz. App. Unpub. LEXIS 325 (Ct. App. Ariz.
   Mar. 26, 2013)..................................................................................................36

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ............................................................................................39, 40

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945) ................................................................................................9

*Jenkins v. Bolla*,
    600 A.2d 1293 (1992) .........................................................................................24, 25

*Johnston v. Corinthian Tele. Corp.*,
    583 P.2d 1101 (Okla. 1978) ..................................................................................28

*Jones v. City of Phila.*,
    73 Pa. D. & C.4th 246 (2005) *aff'd*, 893 A.2d 837 (2006) ................................39, 40

*Joseph v. Scranton Times, L.P.*,
    129 A.3d 404 (Pa. 2015) ......................................................................................31

*Karraker v. Rent-A-Center, Inc.*,
    239 F. Supp. 2d 828 (C.D. Ill. 2003) ...................................................................23

*Keeshan v. Home Depot, U.S.A., Inc.*,
    No. 00-529, 2001 U.S. Dist. LEXIS 3607 (E.D. Pa. Mar. 27,2001), *aff'd*,
    35 F. App'x 51 (3d Cir. 2002) ..............................................................................34

*Kelley v. Bonney*,
    606 A.2d 693 (Conn. 1992) ..............................................................................28, 37

*Kline v. Sec. Guards, Inc.*,
    386 F.3d 246 (3d Cir. 2004) .................................................................................21

*Kloth v. S. Christian Univ.*,
    320 F. App'x 113 (3d Cir. 2008) ..........................................................................14

*Kramer v. Tribe*,
    No. 93-5361, 1994 U.S. Dist. LEXIS 13077 (D.N.J. May 12, 1994) ................16, 19

*Kurz v. Holiday Hosp. Franchising, LLC*,
    No. 19-2129, 2019 U.S. Dist. LEXIS 175193 (E.D. Pa. Oct. 7, 2019) ........9, 10, 11

*In re Levine's Estate*,
    118 A.2d 741 (1955) ............................................................................................40

*Linnet v. Hitchcock*,
    471 A.2d 537 (Pa. Super. 1984) ..........................................................................40

**Page(s)**

*Lombardo v. Gasparini Excavating Co.*,
123 A.2d 663 (Pa. 1956) .........................................................................................40

*Luper v. Black Dispatch Pub. Co.*,
675 P.2d 1028 (Okla. Civ. App. 1984) ....................................................................28

*Luther v. Kia Motors Am., Inc.*,
676 F. Supp. 2d 408 (W.D. Pa. 2009) ......................................................................43

*M.N.C. Corp. v. Mt. Lebanon Medical Center, Inc.*,
509 A.2d 1256 (Pa. 1986) .......................................................................................40

*MacElree v. Phila. Newspapers, Inc.*,
674 A.2d 1050 (Pa. 1996) .......................................................................................33

*Manion v. Sarcione*,
192 F. Supp. 2d 353 (E.D. Pa. 2001) ......................................................................26

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ...........................................................................................31, 34

*Mayer v. Belichick*,
605 F.3d 223 (3d Cir. 2010) ......................................................................................1

*McAndrew v. Scranton Repub. Pub. Co.*,
364 Pa. 504 (1950) ..................................................................................................33

*McCafferty v. Newsweek Media Grp., Ltd.*,
955 F.3d 352 (3d Cir. 2020) ....................................................................30, 31, 32, 33

*Mellon Bank v. Farino*,
960 F.2d 1217 (3d Cir. 1992) ....................................................................................9

*Metcalfe v. Renaissance Marine, Inc.*,
566 F.3d 324 (3d Cir. 2009) ....................................................................................13

*Monkton Ins. Servs., Ltd. v. Ritter*,
768 F.3d 429 (5th Cir. 2014) ...................................................................................10

*Morgan v. Celender*,
780 F. Supp. 307 (W.D. Pa. 1992) .............................................................24, 25, 26, 29

*Morgenstern v. Fox Television Stations of Phila.*,
No. 08-0562, 2008 WL 4792503 (E.D. Pa. Oct. 31, 2008) ....................................34

<u>**TABLE OF AUTHORITIES**</u>
**(continued)**

**Page(s)**

*Morse v. Lower Merion Sch. Dist.*,
 132 F.3d 902 (3d Cir. 1997)..................................................................................20

*Murray v. Am. LaFrance, LLC*,
 2018 Pa. Super 267 (Sep. 25, 2018), *withdrawn*, 2018 Pa. Super. LEXIS 1320
 (Pa. Super. Ct. Dec. 7, 2018) ...............................................................................11

*NAACP v. Clairborne Hardware Co.*,
 458 U.S. 886 (1982)..............................................................................................39

*Nanavati v. Burdette Tomlin Mem'l Hosp.*,
 857 F.2d 96 (3d Cir. 1988).....................................................................................39

*Neish v. Beaver Newspapers, Inc.*,
 581 A.2d 619 (Pa. Super. 1990)............................................................................40

*New York Times Co. v. Sullivan*,
 376 U. S. 254 (1964)..............................................................................................30

*O'Connor v. Sandy Lane Hotel Co.*,
 496 F.3d 312 (3d Cir. 2007)................................................................................9, 12

*O'Donnell v. United States*,
 891 F.2d 1079 (3d Cir. 1989).................................................................................22

*Overhill Farms, Inc. v. Lopez*,
 190 Cal. App. 4th 1248 (2010) ..............................................................................34

*Pearson v. Dodd*,
 410 F.2d 701 (D.C. Cir. 1969)...........................................................................23, 26

*Peoples Mortg. Co. v. Fed. Nat'l Mortg. Ass'n*,
 856 F. Supp. 910 (E.D. Pa. 1994) .........................................................................40

*Philadelphia Newspapers, Inc. v. Hepps*,
 475 U.S. 767 (1986)..............................................................................................34

*Phillips v. Cty. of Allegheny*,
 515 F.3d 224 (3d Cir. 2008)...................................................................................37

*Pinker v. Roche Holdings Ltd.*,
 292 F.3d 361 (3d Cir. 2002)......................................................................................9

*Raible v. Newsweek, Inc.*,
 341 F. Supp. 804 (W.D. Pa. 1972).........................................................................33

<u>**TABLE OF AUTHORITIES**</u>

**(continued)**

**Page(s)**

*Remick v. Manfredy,*
 238 F.3d 248 (3d Cir. 2001).........................................................................12, 13, 15

*Reynolds v. Turning Point Holding Co.,LLC,*
 No. 2:19-cv-01935, 2020 U.S. Dist. LEXIS 33163 (E.D. PA. Feb. 26, 2020)........................11

*Rosenblatt v. Baer,*
 383 U.S. 75 (1966)...........................................................................................28

*Rush v. Phila. Newspapers, Inc.,*
 732 A.2d 648 (Pa. Super. 1999)...........................................................................30

*Santiago v. Warminster Twp.,*
 629 F.3d 121 (3d Cir. 2010)...........................................................................15, 20

*Scott-Taylor, Inc. v. Stokes,*
 229 A.2d 733 (Pa. 1967).....................................................................................32

*Sewell v. Brookbank,*
 425, 581 P.2d 267 (Ariz. Ct. App. 1978)................................................................28

*Sheppard v. Nicholas,*
 374 F. Supp. 804 (W.D. Pa. 1974)...................................................................16, 17

*Smith v. Borough of Dunmore,*
 633 F.3d 176 (3d Cir. 2011)......................................................................26, 29, 30

*Smyth v. Pillsbury Co.,*
 914 F. Supp. 97 (E.D. Pa. 1996) .........................................................................22

*Snyder v. Phelps,*
 562 U.S. 443 (2011)................................................................................... *passim*

*Spear v. Marriott Hotel Servs., Inc.,*
 No. 15-6447, 2016 WL 194071 (E.D. Pa. Jan. 15, 2016)............................................11

*Sprague v. Walter,*
 543 A.2d 1078 (Pa. 1988)...................................................................................31

*St. Amant v. Thompson,*
 390 U.S. 727 (1968)..........................................................................................30

*St. Surin v. Virgin Islands Daily News, Inc.,*
 21 F. 3d 1309 (3d Cir. 1994)...............................................................................34

TABLE OF AUTHORITIES
(continued)

Page(s)

*Sullivan v. A. W. Chesterton, Inc. (In re Asbestos Prods. Liab. Litig. (No. VI))*,
384 F. Supp. 3d 532 (E.D. Pa. 2019) ..........................................................................11

*Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*,
5 F.3d 28 (3d Cir. 1993)...............................................................................................13

*Sweeney v. Phila. Record Co.*,
126 F.2d 53 (3d Cir. 1942)...........................................................................................33

*Telcordia Tech Inc. v. Telkom SA Ltd.*,
458 F.3d 172 (3d Cir. 2006)..........................................................................................11

*TES Franchising, LLC v. Dombach*,
No. 10-0017, 2010 WL 5071472 (E.D. Pa. Nov. 24, 2010) ...............................43, 44

*Thomas v. E.B. Jermyn Lodge No. 2*,
693 A.2d 974 (Pa. Super. 1997)....................................................................................43

*Thomas v. Pearl*,
998 F.2d 447 (7th Cir. 1993) .........................................................................................23

*Thornhill v. Alabama*,
310 U. S. 88 (1940).......................................................................................................24

*Time, Inc. v. Hill*,
385 U.S. 374 (1967)......................................................................................................30

*ToDay's Housing v. Times Shamrock Commc'ns*,
21 A.3d 1209 (Pa. Super. 2011)....................................................................................34

*Toys "R" Us, Inc. v. Step Two, S.A.*,
318 F.3d 446 (3d Cir. 2003)..........................................................................................14

*Tucker v. Phila. Daily News*,
848 A.2d 113 (Pa. 2004)...............................................................................................31

*United States Healthcare, Inc. v. Blue Cross of Greater Phila.*,
898 F.2d 914 (3d Cir. 1990)..........................................................................................39

*Veilleux v. Nat'l Broad. Co.*,
206 F.3d 92 (1st Cir. 2000)...........................................................................................39

*W.G. Nichols v. CSK Auto, Inc.*,
No. 01-03789, 2001 U.S. Dist. LEXIS 19121 (E.D. Pa. Nov. 21, 2001) ............13, 14

TABLE OF AUTHORITIES
(continued)

**Page(s)**

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
    712 F.3d 165 (3d Cir. 2013)..................................................................6

*Walnut St. Associates v. Brokerage Concepts, Inc.*,
    389, 20 A.3d 468 (Pa. Super. 2010)........................................................40

*Wilson v. Slatalla*,
    970 F. Supp. 405 (E.D. Pa. 1997) ...........................................................34

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997)..........................................................14

**Statutes**

42 Pa.C.S.A. § 5322...............................................................................8

42 Pa.C.S.A. § 5332(b)...........................................................................8

15 Pa. C.S. § 411.................................................................................11

**Other Authorities**

Fed. R. Civ. P. 4(k)(1)(A).......................................................................8

Fed. R. Civ. P. 12(b)(2).........................................................................1

Fed. R. Civ. P. 12(b)(6)...................................................................1, 20, 43

Fed. R. Evid. 803(6)............................................................................38

*Restatement (Second) of Torts* .................................................................30

*Restatement (Second) of Agency* § 228 (1958) ...............................................16, 17

*Restatement (Second) of Torts* § 565D, Special Note on Relation ................................35

*Restatement (Second) of Torts* § 652B (1977).............................................21, 22

*Restatement (Second) of Torts*, § 652B, comment b.......................................21, 22, 23

*Restatement (Second) of Torts* § 652D .................................................24, 35

*Restatement (Second) of Torts* § 652E.......................................................30

Defendant President and Fellows of Harvard College ("Harvard") respectfully submits this memorandum of law in support of its motion to dismiss the amended complaint of plaintiff Francesca Viola ("Prof. Viola") pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## I.      INTRODUCTION

This case arises out of a series of tweets posted on the personal Twitter account of defendant Joshua Benton ("Benton").  Benton is the founder and director of the Nieman Journalism Lab ("Nieman Lab"), which operates a journalism website funded by the Nieman Foundation for Journalism at Harvard.  *See* Amended Complaint ("AC"), ¶ 2; *see also* https://www.niemanlab.org.

Benton's tweets disclosed that Prof. Viola, an "award winning, respected journalist and journalism professor" at the Klein College of Media and Communication at Temple University, had posted a number of controversial comments to online news articles under the pseudonym "truthseeker."  *See* AC, ¶¶ 1, 7, 38-40, 44, 51, and Exhibit K at 1-3 (Dkt. 10-11); *see also* Motion to Dismiss, Exhibit A.[1]  Although Benton posted the tweets disclosing Prof. Viola's identity on his personal Twitter account ("@benton"), not on the Nieman Lab's Twitter account, Prof. Viola seeks to recover against Harvard on a variety of tort and contract claims.  *See* AC, Counts I-IX.

Prof. Viola's claims against Harvard should be dismissed for lack of both general and specific personal jurisdiction.  General jurisdiction does not exist because Harvard's place of incorporation and principal place of business is Massachusetts, not Pennsylvania.  Specific jurisdiction does not exist because Prof. Viola's claims arise out of tweets Benton sent from his

---

[1] Exhibit A to the Motion to Dismiss contains complete copies of the "truthseeker" comments referenced in plaintiff's complaint.  *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (court's ruling on a motion to dismiss may consider "documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the complaint, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case") (citation omitted); *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

personal Twitter account, and not out of any purposeful activities of Harvard in Pennsylvania.  All of plaintiff's claims against Harvard therefore should be dismissed for lack of personal jurisdiction.

Apart from and in addition to the lack of personal jurisdiction over Harvard, the complaint fails to state a claim upon which relief may be granted against Harvard.  Reduced to essentials, Prof. Viola alleges that Harvard is responsible for Benton wrongfully disclosing that she had posted controversial comments to several news articles under the pseudonym "truthseeker."  As shown below, both Pennsylvania law and the First Amendment preclude Prof. Viola's attempt to recover damages in tort for the publication of either accurate or non-defamatory information on a matter of legitimate public concern, requiring the dismissal of those claims as a matter of law.  The remaining two claims asserted against Harvard (breach of contract and promissory estoppel) also fail as a matter of law because, as shown below, the amended complaint fails to identify any promise to Prof. Viola, contractual or otherwise, that Harvard breached.  Accordingly, all of Prof. Viola's claims against Harvard should be dismissed either on personal jurisdiction grounds or on the merits.[2]

## II.    STATEMENT OF FACTS

### A.    Prof. Viola's "truthseeker" postings

On May 4, 2018, the Nieman Lab published an online article headlined "People who are delusional, dogmatic, or religious fundamentalists are more likely to believe fake news."  *See* AC, Exhibit H (Dkt. 10-8).  The article reported on a working paper presented at a Schizophrenia International Research Conference by five members of the Yale University faculty.  *Id.* at 2.  The authors of the working paper had found that the "[b]elief in fake news was associated with

---

[2] Because there is no material difference between Pennsylvania and Massachusetts law on the issues addressed in this motion, the Court need not engage in a choice of law analysis.  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007).

increased endorsement of delusion-like ideation[.]"  *Id.*  A reader posted a critical comment about the article under the name "Alexander Best," describing it as "just another illustration of 'fake' news."

AC, ¶ 36; *id.* Exhibit I (Dkt. 10-9).

Prof. Viola, an "award winning, respected journalist and journalism professor" who "cultivated a stellar reputation" as a public university faculty member, also read the article and decided to add a comment of her own.  AC, ¶¶ 1, 7-8, 36-37.  Posting under the pseudonym "truthseeker," Prof. Viola disclosed that, as a "journalism professor at a major east coast university," she agreed with Alexander Best:

> I am a journalism professor at a major east coast university and I completely agree with you.  I follow Nieman but this is an article designed to insinuate that 1) Trump supporters who happen to be religious are delusional 2) conservative media that don't tout the democrat party talking points are disseminating 'fake news.'  I will no longer use Neiman [sic] as a source.

*See* AC, ¶ 37; *id.* Exhibit J (Dkt. 10-10).

Prof. Viola previously had used her "truthseeker" account to post comments to articles in publications other than the Nieman Lab.  For example, she posted a "truthseeker" comment in response to an article on the *Philadelphia Inquirer* website, disclosing that she was a college journalism professor with a law degree.  On the subject of crimes involving African Americans and anti-Muslim and anti-immigrant messages, Prof. Viola said:

> You are stereotyping Trump voters, as many libs do.  I am a college professor with a law degree, and I voted for Trump, because I don't need to be told what to think by all you sanctimonious left wingers, including Obama and Shrillary.
> ***
> I am a journalism professor and I[']ll tell you why I won[']t subscribe.  Your coverage is virulently pro-leftist, and you try to control speech, which is antithetical to the First Amendment you claim to respect.  How?  *I've been tracking your pattern of not allowing comments on any stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments.*  Although you and your editorial team may find these opinions uncomfortable and even repulsive, the First

Amendment protects those opinions, and you as the standard bearers for the fourth estate have an obligation to let folks express themselves.  You are failing members of the public you don't agree with, and that is why you will never expand your readership.

AC, Exhibit K at 2-3 (Dkt. 10-11); *see also* Motion to Dismiss, Exhibit A at A-6.

In another "truthseeker" post, Prof. Viola commented on the murder of Democratic National Committee employee Seth Rich, again citing her status as a college professor and attorney:

Really, you hater?  I'm a college professor and an attorney; I'm not overweight and I don't drink.  I watch Hannity and he is absolutely right about this Seth Rich thing.  You are obviously a bitter democrat who doesn't want to face up to the fact that the DNC is corrupt, and like Hillary will do anything to preserve power…even murder.
                                                    ***
Seth Rich leaked the DNC plot to sabotage Bernie to Wikileaks.  The DNC had him killed.  This Russia story was manufactured as a distraction.  You stupid libs keep pushing the Russian narrative with not one shred of evidence.  And don't tell me "19 intelligence agencies say so."  But notice they never offer solid factual evidence.  But if there's any justice, the truth will come out.  Just like we learned eventually that the democrat talking points about the Benghazi murders being caused by an anti-Muslim video were a lie, the democrat attempt to deflect from corruption and murder saying "the Russians did it" will be proven to [be] yet another lie.  Keep it up Dems.  You'll just keep losing elections till you cease to exist as a party.  I can hardly wait.

AC, Exhibit K at 2 (Dkt. 10-11); Motion to Dismiss, Exhibit A at A-2, A-3.

In another "truthseeker" post, Prof. Viola contended that President Trump won the popular vote in the 2016 Presidential election:

You have no idea what my religion is and the reason Trump won is because more people voted for him than your girl.  And save your tired breath on the tired refrain that Hillary won the popular vote because of some illegal votes cast in California.  Yawn.  So thank God people with common sense outnumber people like you.

AC, Exhibit K at 3 (Dkt. 10-11); Motion to Dismiss, Exhibit A at A-7.

Prof. Viola also posted on the Breitbart News website under an article headlined "Deep State Leaks Highly Classified Info to Washington Post to Smear President Trump":

I'm not reading Drudge anymore.  Ever since Trump got elected he links to the lib

mainstream media way to[o] much.  Starting to think there's been a management change.

* * *

I agree.  Has Drudge sold the franchise to a lib?  The headlines and links are pro-lib.  Reading Zero Hedge now, not Drudge.

AC, Exhibit K at 1 (Dkt. 10-11); Motion to Dismiss, Exhibit A at A-4.

The "truthseeker" account also published a comment to a Gateway Pundit article headlined, "Muslims Take Over Street—Start Praying in Front of Trump Tower New York for Ramada[n]." The comment read:  "Scum.  Deport them.  They hate us.  Get rid of them."  AC ¶ 52; *id.* Exhibit K at 2 (Dkt. 10-11 at 2); *see also* Motion to Dismiss, Exhibit A at A-5.

In her first complaint, as in her initial demand letter to Harvard, Prof. Viola admitted that she had posted the Gateway Pundit comment.  Her original complaint (Dkt. 1) alleged that Benton "identif[ied] previous comments posted using the same Truthseeker account," *id.* ¶ 31, and disclosed the "subject of Plaintiff's posts," which she considered "a matter of her own private opinion" *id.* ¶¶ 31, 54-55, as to which she had a "reasonable expectation of privacy," *id.* ¶ 62.  *See also* Motion to Dismiss, Exhibit B (July 18, 2018 Demand Letter) at 2 (citing "truthseeker's' Gateway Pundit comment) and at 3 ("Your tweets identified Ms. Viola by name, stated the name of her employer, and criticized other comments posted to other websites through the Disqus platform *by the same 'truthseeker' account*.") (emphasis added).[3]

After Harvard filed a motion to dismiss her original complaint (Dkt. 8-1), and almost two years after admitting in her initial demand letter that she posted the Gateway Pundit "truthseeker" comment, Prof. Viola suddenly repudiated her prior admissions by amending her complaint and,

---

[3] *See also* Original Complaint, ¶ 41 ("this practice of publicly identify[ing] or publishing private information about someone" ... "is defined as 'doxxing'"); *id.* ¶ 30 (Benton "discover[ed] Viola's true identity"); *id.* ¶ 32 (Benton "revealed her identity in association with the Truthseeker account"); *id.* ¶ 51 (Benton wrongfully discovered her "true identity in association with the Truthseeker account").

for the first time, denying that she published the Gateway Pundit comment, claiming that it is not consistent with her views of Muslims.  AC ¶¶ 52-53.  She does not, however, deny that she authored any of the other "truthseeker" comments cited above, nor does she claim that any of them are "not consistent with her public or private views[.]"  *Id.* ¶ 53.[4]

B.    <u>**Benton's Tweets about Viola**</u>

Benton read Prof. Viola's "truthseeker" comment concerning the Nieman Lab article.  AC, ¶ 39.  As director of the Nieman Lab, "Benton had administrative access to view Viola's email address associated with [her] comment," and he used his administrative access to identify Prof. Viola as "truthseeker."  *Id.* ¶¶ 38-40.  He located additional truthseeker comments posted on other websites, including comments in the *Philadelphia Inquirer* and on Breitbart.  *Id.* ¶¶ 41, 68-69; *see also* Motion to Dismiss, Exhibit A.

Benton then posted a series of "tweets" on his personal Twitter account (@benton) identifying Prof. Viola as the "truthseeker."  (None of the tweets were posted on the Nieman Lab's Twitter page, which is @NiemanLab.)  Based upon Prof. Viola's "truthseeker" comments (copied in his tweets), Benton questioned Prof. Viola's qualifications to teach journalism at Temple, a public university.  AC, Exhibit K (Dkt. 10-11); Motion to Dismiss, Exhibit A at A-1.  Benton's first tweet, which included a link to the Nieman Lab article and a screenshot of Prof. Viola's "truthseeker" comment, stated:

> I think that this attitude — permanently rejecting a news source because it accurately reports something you don't like — is exactly what you want in a journalism professor, yes? Also, spell our name right, Francesca Viola of Temple

---

[4] Harvard's motion to dismiss assumes, as it must, the truth of Prof. Viola's recovered memory concerning the Gateway Pundit "truthseeker" comment.  *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172-73 (3d Cir. 2013) ("[A]t the motion to dismiss stage, when the district court typically may not look outside the four corners of the amended complaint, the plaintiff cannot be bound by allegations in the superseded complaint."); *but see id.* at 173 ("[A] party's assertion of contrary factual positions in the pleadings is [not] without consequence," as the court may consider a statement made in a superseded complaint "as rebuttable evidence when determining whether summary judgment is proper" (citation omitted).  As shown below, the belated reversal of course fails to cure the fatal legal defects in the amended complaint.

University  http://niemanlab.org/2018/05/people-who-are-delusional-dogmatic-or-religious-fundamentalists-are-more-likely-to-believe-fake-news/

AC, ¶ 51 (a); *id.*, Exhibit K at 1 (Dkt. 10-11).

There followed five additional tweets displaying and commenting on additional "truthseeker" comments posted in other publications:

> For what it's worth, Temple Journalism professor Francesca Viola also believes Seth Rich was murdered by Hillary Clinton and the DNC.
> ***
> She also believes @DRUDGE_REPORT has sold out to the libs[.]
> ***
> She's also not a particular fan of Muslims, it seems.
> ***
> She seems to lack a basic understanding of the First Amendment and is upset that @PhillyInquirer doesn't "give readers a chance to express any anti-Muslim or anti-immigrant sentiments" or comment on "crimes involving African Americans[.]"
> ***
> Oh, she also believes that Trump actually won the *real* popular vote, which was warped by "some illegal votes cast in California[.]"

AC, ¶¶ 51 (b)-(f); *id.*, Exhibit K at 1-3 (Dkt. 10-11).  Benton concluded by tweeting "Basically, Francesca Viola of @TempleUniv is pretty much exactly what you want in a journalism professor. cc: @dboardman @ pilhofer @brcreech."  AC, ¶ 51 (g); *id.*, Exhibit K at 3 (Doc. 10-11); Motion to Dismiss, Exhibit A at A-7.  The Twitter addresses included by Benton in his last tweet were the accounts for Temple University, the Dean of Temple's Klein College of Media Communications, and two Temple journalism professors.  AC, ¶ 49.

On May 9, 2018, Benton posted the following statement on his personal Twitter account:

> In a series of tweets on Friday, May 4, I wrote about an anonymous commenter to a Nieman Lab story.  I identified her and her place of work and shared comments posted from the same account on other websites.  By revealing such details without making an effort to contact her and seek confirmation and explanation, and otherwise adhere to rigorous reporting methods, the tweets did not meet Nieman's journalistic standards.  I apologize and regret my error in judgment.

AC, Exhibit L (Dkt 10-12).

C.    **Harvard's Contacts with Pennsylvania**

Harvard is a charitable corporation organized under the laws of Massachusetts with a principal place of business in Cambridge, Massachusetts.  *See* Declaration of Bradley E. Abruzzi ("Abruzzi Decl."), ¶ 2.  *See also* AC, ¶ 3.  The university does not have any place of business or bank accounts within the Commonwealth of Pennsylvania and does not own or rent any real property in Pennsylvania.  *Id*., ¶ 4.

Harvard's contacts with Pennsylvania principally consist of recruiting activities, communications with students and alumni, and fundraising.  The university also offers remote classes to students throughout the country and internationally, including some students who reside in Pennsylvania.  *See* Abruzzi Decl., ¶ 5.  The university is registered with the Pennsylvania Department of State to conduct business in Pennsylvania as a Foreign Non-Profit (Non Stock) corporation.  *Id.* ¶ 3 and Exhibit A thereto (copy of registration form).

### III.    ARGUMENT

A.    **The Court Lacks Personal Jurisdiction Over Harvard.**

Federal Rule of Civil Procedure 4(k) provides that filing a waiver of service (as Harvard did in this case) establishes personal jurisdiction only if a defendant "is subject to the jurisdiction of a Court of general jurisdiction in the state where the district Court is located[.]"  Fed. R. Civ. P. 4(k)(1)(A).  Under Pennsylvania's long-arm statute, 42 Pa.C.S.A. § 5322, the jurisdiction of Pennsylvania state courts extends "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  42 Pa.C.S.A. § 5332(b).  The relevant inquiry thus is whether the exercise of jurisdiction over Harvard "comports with the limits imposed by federal due process." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citation omitted).

Due process requires a plaintiff to show that a non-resident defendant has sufficient

"minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (citation and collecting cases omitted). "A federal court must possess one of two forms of personal jurisdiction to comport with these principles: either general jurisdiction or specific jurisdiction." *Kurz v. Holiday Hosp. Franchising, LLC*, No. 19-2129, 2019 U.S. Dist. LEXIS 175193, at *6 (E.D. Pa. Oct. 7, 2019) (citations omitted); *see also O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).

"Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." *Id.* at 316 (citing *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)); *see also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). The plaintiff must show, "with reasonable particularity," sufficient contacts between the defendant and the forum state to support the exercise of personal jurisdiction. *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (citations and quotation marks omitted); *see also Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 418 (E.D. Pa. 2005) ("In order to establish a *prima facie* case, the plaintiff must present specific facts that would allow the court to exercise jurisdiction over the defendant." (citation omitted)). As shown below, Prof. Viola's amended complaint falls far short of plausibly alleging a *prima facie* case of general or specific jurisdiction over Harvard.

### 1.     Harvard Is Not Subject to General Jurisdiction in Pennsylvania

General jurisdiction exists when a foreign defendant's affiliations with the State are so "continuous and systematic," and so "constant and pervasive," as to render it "essentially at home in the forum State." *Daimler*, 571 U.S. at 122 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation marks omitted)). In such cases, jurisdiction is proper regardless of whether the claim results from the party's forum-related activities. *Kurz*, 2019 U.S. Dist. LEXIS 175193, at *6.

"The paradigm forums in which a corporate defendant is at home . . . are the corporation's place of incorporation and its principal place of business . . . ." *Id.* at *7 (internal quotation marks and citations omitted); *see also Daimler*, 571 U.S. at 137 (quoting *Goodyear*, 564 U.S. at 924). "These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Daimler*, 571 U.S. at 137.

The Third Circuit has recognized that it is "incredibly difficult to establish general jurisdiction [over a corporation] in a forum other than the place of incorporation or principal place of business." *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (quoting *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)) (emphasis omitted); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("[I]n our view *Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases."); *Kurz*, 2019 U.S. Dist. LEXIS 175193, at *7-8.

In *Kurz*, for example, this Court held that a foreign defendant's ownership, operation, franchising, and advertising of numerous hotels within the Eastern District of Pennsylvania was not sufficient to establish the "continuous and systematic" contacts needed to establish general jurisdiction. *Id.* at *9-10.

> [I]n the post-*Daimler* legal landscape, the fact that an out-of-state entity transacts business, even substantial business, in Pennsylvania is insufficient to establish that the entity is "at home" in Pennsylvania. … In *Goodyear*, the Supreme Court concluded that even "tens of thousands" of a foreign manufacturer's tires entering the forum over a three-year period was insufficient to trigger general jurisdiction because, despite those sales, the foreign corporation was not regarded as "at home" in that state. *Id.* In *Daimler*, the Supreme Court held that despite the fact that ten percent of a foreign defendant's sales occurred within the forum state, such sales did not render Daimler "at home" in the forum.

*Id.* at *10-11 (citing *Goodyear*, 564 U.S. at 921, 927-931; *Daimler*, 571 U.S. at 138-39).[5]

As in *Kurz*, the complaint's allegations in this case "fall short of showing that [Harvard] is 'essentially at home' in Pennsylvania." 2019 U.S. Dist. LEXIS 175193, at *11 (citations omitted). The complaint contains no allegations supporting such a claim. "Because Plaintiff has made no showing that [Harvard's] contacts with Pennsylvania 'are so continuous and systematic as to render it essentially at home in this state,' *Daimler*, 571 U.S. at 139 (internal quotations and citation omitted in original), this Court lacks general jurisdiction over Defendants." *Kurz, 2019 U.S. Dist. LEXIS 175193,* at *12.[6]

**2.    Pennsylvania Does Not Have Specific Jurisdiction Over Harvard.**

Specific jurisdiction "allows the court to hear claims that arise from or relate to the party's contacts with the forum state, such that the defendant should reasonably anticipate being haled into court in that forum." *Kurz*, 2019 U.S. Dist. LEXIS 175193, at *8 (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 & n.8 (1984); *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006)). *See also Goodyear*, 564 U.S. at 919 ("[S]pecific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that

---

[5] *See also id.* at 10 (citing *Spear v. Marriott Hotel Servs., Inc.*, No. 15-6447, 2016 WL 194071, at *3 (E.D. Pa. Jan. 15, 2016)) ("Applying the considerations of *Daimler* and *Goodyear*, the mere allegation that defendants operate in the State does not render defendants 'at home' in Pennsylvania and subject it to general jurisdiction here."); *Campbell v. Fast Retailing USA, Inc.*, No. 14-6752, 2015 WL 9302847, at *2-3 (E.D. Pa. Dec. 22, 2015) (citing *Daimler* and holding that "[t]he allegation that an entity transacts business, even substantial business, in Pennsylvania is insufficient to establish that it is essentially 'at home' in Pennsylvania."); *Farber v. Tennant Truck Lines, Inc.*, 84 F. Supp. 3d 421, 432 (E.D. Pa. 2015) ("A corporation is not 'at home' in 'every state in which it engages in a substantial, continuous, and systematic course of business.'")) (emphasis omitted).

[6] Under *Daimler*, Harvard's registration as a foreign non-profit to do business in Pennsylvania does not satisfy the constitutional requirements for the exercise of personal jurisdiction. *See Sullivan v. A. W. Chesterton, Inc. (In re Asbestos Prods. Liab. Litig. (No. VI))*, 384 F. Supp. 3d 532, 534 (E.D. Pa. 2019) ("[T]he Pennsylvania statutory scheme that requires foreign corporations to register to do business and, therefore, to consent to general personal jurisdiction in Pennsylvania, offends the Due Process Clause and is unconstitutional . . . ."); *Reynolds v. Turning Point Holding Co.*, LLC, No. 2:19-cv-01935, 2020 U.S. Dist. LEXIS 33163, at *14-15 (E.D. Pa. Feb. 26, 2020) (Wolson, J.) (adopting *Sullivan* and granting motion to dismiss on personal jurisdiction grounds); *Spear,* 2016 WL 194071, at *3 (registration to do business in Pennsylvania, by itself, is insufficient to establish general jurisdiction). *See also Murray v. Am. LaFrance, LLC*, 2018 Pa. Super 267 (Sep. 25, 2018), *withdrawn*, 2018 Pa. Super. LEXIS 1320 (Pa. Super. Ct. Dec. 7, 2018) (ordering rehearing by en banc panel on constitutionality of 15 Pa. C.S. § 411 in light of *Daimler*).

establishes jurisdiction.'" (citation omitted)).

The Third Circuit applies a three-part test to determine whether specific jurisdiction exists: (1) the defendant must have "purposefully directed [its] activities at the forum"; (2) the litigation must "arise out of or relate to at least one of those activities"; and (3) if the first two requirements are met, the exercise of jurisdiction must "otherwise comport[] with fair play and substantial justice." *O'Connor*, 496 F.3d 312, 317 (3d Cir. 2007) (citation and quotation marks omitted). *See also Goodyear*, 564 U.S. at 919 (specific jurisdiction requires "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation") (quotation marks and brackets omitted). As shown below, the amended complaint fails to plausibly allege that Pennsylvania may exercise specific jurisdiction over Harvard with respect to either the contract-based or tort claims asserted by Prof. Viola.

> **a.      The Court Lacks Specific Jurisdiction over Harvard on Prof. Viola's Contract-Based Claims.**

The amended complaint does not plausibly allege that Harvard "purposefully directed" any activities towards Pennsylvania that are in any way related to Prof. Viola's contract-based claims. *See* Amended Complaint, Count VI (Breach of Contract) and Count VII (Promissory Estoppel). *See also Crouse v. Cyclops Indus.*, 745 A. 2d 606, 610 (2000) ("[A]s promissory estoppel makes otherwise unenforceable agreements binding, the doctrine sounds in contract law"); *Remick v. Manfredy*, 238 F.3d 248, 255-56 (3d Cir. 2001) ("[B]ecause there are different considerations in analyzing jurisdiction over contract claims and over certain tort claims, we believe such differentiation [in personal jurisdiction analysis] is required").

In determining specific jurisdiction over a breach of contract claim, courts consider "the totality of the circumstances, including the location and character of the contract negotiations, the

terms of the contract, and the parties' actual course of dealing." *Id.* at 256 (citation omitted). "[A] contract, 'without more, is insufficient to establish minimum contacts,' as are 'informational communications' in furtherance of a contract." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 333 n.7 (3d Cir. 2009); *see also Sunbelt Corp. v. Noble, Denton & Assocs., Inc.*, 5 F.3d 28, 32 (3d Cir. 1993) ("It is well established, however, that a nonresident's contracting with a forum resident, without more, is insufficient to establish the requisite 'minimum contacts' required for an exercise of personal jurisdiction over the nonresident.") (citations omitted).

In the present case, Prof. Viola alleges that she entered into a contract and relied upon a promise made by Harvard when she used the Nieman Lab website after reading the Harvard Privacy Police and the Basic Rules for Disqus posted on the Internet. *See* AC, ¶¶ 24-26, 29-30, 117, 122-24. The amended complaint alleges that Benton breached Harvard's alleged contractual and promissory obligations by accessing and then publishing her identity, but does not allege that any of that conduct occurred in Pennsylvania. *Id.* ¶¶ 39-44, 118, 125. Prof. Viola's claim of specific jurisdiction thus rests on nothing more than her allegations that after she entered into an online contract with Harvard and relied upon an online promise made by Harvard, the University allegedly broke its contract and promise by conduct that occurred in Massachusetts. These are insufficient forum contacts on which to rest specific jurisdiction over contract-based claims.

In *W.G. Nichols v. CSK Auto, Inc.*, No. 01-03789, 2001 U.S. Dist. LEXIS 19121 (E.D. Pa. Nov. 21, 2001), for example, the court granted a motion to dismiss for lack of personal jurisdiction where the plaintiff sued the defendant for breach of contract and other claims, alleging the defendant failed to pay for merchandise received. The court held that there was no jurisdiction over the contract claim (as opposed to the tort claims) notwithstanding the defendant's breach of its obligation to send payments to the forum state. *Id.* at *6-7. Because the parties' course of

dealing was limited to periodic purchases of merchandise, and because there was no allegation that the defendant ever sent a representative into the forum or did anything in the forum related to the parties' contract, there was no specific jurisdiction over the breach of contract claim. *Id.* at \*7.

The burdens imposed on establishing specific jurisdiction based on Internet contacts, as alleged here, are even more daunting.  It is well-established that a non-resident's operation of a website accessible to Pennsylvania residents (such as the Nieman Lab's website) is insufficient to establish personal jurisdiction. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world."); *Kloth v. S. Christian Univ.*, 320 F. App'x 113, 116-17 (3d Cir. 2008) (plaintiff's enrollment in non-resident university's online "distance learning program" that facilitated communications between plaintiff, faculty, and classmates was insufficient to establish a prima facie case of personal jurisdiction for a breach of implied contract claim); *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 212 (3d Cir. 2014) (affirming dismissal on personal jurisdiction grounds where non-resident's website did little more than advertise on the Internet in Pennsylvania and allow potential customers to email requests for appointments); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-24 (W.D. Pa. 1997) ("A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.") (citation omitted).

The foregoing principles compel the legal conclusion that Prof. Viola's claims for breach of contract and promissory estoppel against Harvard (Amended Complaint, Counts VI and VII) should be dismissed for lack of specific jurisdiction.  Like the plaintiffs in *CSK Auto*, *Kloth*, and *Ackourey*, Prof. Viola's allegations that a non-resident defendant violated a contract and a promise

made online fall far short of establishing specific jurisdiction for her contractual and promissory claims.

b.     **The Court Lacks Specific Jurisdiction over Harvard on Prof. Viola's Tort Claims.**

Determining whether the court may exercise specific jurisdiction over Harvard with respect to Prof. Viola's tort claims requires a different analysis, *see Remick*, 238 F.3d at 255-56, but the outcome remains the same.  Instead of alleging a plausible *prima facie* case of specific jurisdiction over Harvard with respect to her tort claims, Prof. Viola repeatedly incants (no less than ten times) the conclusory allegation that Benton was acting within the "course and scope" his employment at Harvard when he published information *not* on the Nieman Lab's website or on Nieman's Twitter account but, rather, on his own personal Twitter account.  *See* AC ¶¶ 2, 39, 40, 41, 44, 75, 79, 86, 119, 126.  No matter how many times the amended complaint repeats this legal conclusion, it remains a wholly insufficient basis on which to establish a *prima facie* specific jurisdiction case against Harvard.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Such allegations "are no more than conclusions, [and] are not entitled to the assumption of truth[.]" *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678 (2009)).  *See also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citation omitted)).

 The problem is not just that the amended complaint contains only conclusory allegations that Benton's personal tweets were made within the scope of his employment at Harvard.  The allegations of the amended complaint affirmatively establish that Benton's conduct was *not* within the scope of his employment.

Conduct within the scope of employment has been defined as follows:

> (1) Conduct of a servant is within the scope of employment if, *but only if*: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master[;] and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master.  (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Butler v. Flo-Ron Vending Co.*, 557 A.2d 730, 736 (Pa. Super. 1989) (quoting *Restatement (Second) of Agency* § 228 (1958)) (emphasis added).

In *Deklinski v. Marchetti*, 30 Pa. D. & C.4th 435 (Ct. Com. Pl. Dauphin Cty. 1996) (en banc), for example, the plaintiff claimed that she was libeled by a lobbyist employed by the corporate defendant.  *Id.* at 438-39.  The court agreed that the lobbyist was an agent of the corporate defendant, but held that the plaintiff had failed to show that the statements were made in the scope of the lobbyist's employment.

> [Plaintiff] has not provided any facts to show that, at the time [the lobbyist] made the alleged statements, his conduct was "of the kind he [was] employed to perform," namely lobbying.  Further, other than occurring after the legislative committee meeting, the alleged defamation has not been put in any time frame.  Finally, the facts do not support a claim that [the lobbyist's] actions were "actuated, at least in part, by a purpose to serve the master."  Plaintiff has not specified in what manner [the] alleged defamatory remark was intended to benefit the [principal's] interest in lobbying.

*Id.* at 440.  *See also Sheppard v. Nicholas*, 374 F. Supp. 804, 805 (W.D. Pa. 1974) (employer could not be held liable for defamatory comments made by employee who was not "furthering any business purpose" of his employer at the time the statements were made); *Field v. Omaha Standard, Inc.*, 582 F. Supp. 323, 327 (E.D. Pa. 1983) (merely because a party is an agent for some purposes does not mean that the party is an agent for all purposes), *aff'd*, 732 F.2d 145 (3d Cir. 1984), *cert denied,* 105 S. Ct. 113 (1984).  *See generally Kramer v. Tribe*, No. 93-5361, 1994 U.S. Dist. LEXIS 13077, at *46 (D.N.J. May 12, 1994) (Harvard law professor's engagement as counsel in New Jersey did not subject Harvard to personal jurisdiction because professor was not acting as

agent of the university).

The factual allegations of the amended complaint (as opposed to its legal conclusions) concede that Benton was not "furthering any business purpose" of Harvard when he obtained and disclosed Prof. Viola's identity on his personal Twitter page.   According to the amended complaint, Benton "sought to exact revenge" on Prof. Viola due to his personal "animus toward [her]," and was "motivated by his disdain for, and disagreement with, [her] right leaning political views[.]" AC ¶¶ 44, 45.  So motivated, Benton "intentionally abused" and "improperly used" his administrative access privileges to view Prof. Viola's email for the purpose of publishing her true identity.  *Id.* ¶¶ 39, 69.  *See also id.* ¶¶ 38, 41, 80.  His actions allegedly violated both Harvard's Privacy Statement and a web hosting policy to which Harvard and its employees supposedly were bound.  *Id.* ¶¶ 41, 44.  This obviously was *not* conduct "of the kind he [was] employed to perform" for Harvard, *Deklinski*, 30 Pa. D. & C.4th at 440, did *not* "furthe[r] any business purpose" of Harvard, *Sheppard*, 374 F. Supp. at 805, did *not* "occur substantially within the authorized time and space limits," and was motivated, *not* by a desire to serve his employer but, rather, by his "disdain for, and disagreement with, right leaning political views[.]"  *Restatement (Second) of Agency* § 228; AC, ¶ 34.  *See also Butler*, 557 A.2d 736 (Pa. Super. 1989) (conduct not within the scope of employment if it is different in kind from that authorized or too little actuated by a purpose to serve the master).

The other personal jurisdiction allegations offered by Prof. Viola only further undercut her claim that Benton acted within the scope of his employment.  For example, the amended complaint alleges—on "information and belief"—that in a meeting between Harvard and Benton after the tweets were published, "Harvard acknowledged that [Benton] had been acting in the course and scope of his employment," and that Harvard "ratified" his behavior by taking "no further action"

to "discipline" or "disavow" his conduct.   AC, ¶ 58.   Leaving to one side Prof. Viola's basis for alleging what was said in a private meeting that she did not attend, whether an employee acted within the scope of his or her employment is a question of law for the court to decide, not a matter on which the supposed views of one party—pro or con—may dictate (however such views supposedly were divined by the other party).

Prof. Viola's conclusion, in any event, is logically fallacious.   An employer's decision *not* to discipline an employee sheds no more light on whether the employee's conduct was within his scope of employment than would an employer's decision that an employee *ought to be* disciplined for his conduct.   If anything, the latter decision seems more likely to indicate that the conduct was employment-related than does the former).

Prof. Viola also misinterprets Harvard's "Guidelines For Using Social Media."   *See* AC, Exhibit B (Dkt. 10-2).   The "Guidelines" are just that (and not a "Policy" as the amended complaint alleges).   *See id.* at 2 ("Community members may find that many of these Guidelines can be helpful when thinking about personal social media accounts.   *However, these Guidelines are not intended to govern or restrict personal presence on the web*[.]") (emphasis added).[7]   Prof. Viola interprets the Guidelines as compelling the legal conclusion that, unless Benton expressly stated on his personal Twitter account that the views expressed were his own, he must have been acting in the scope of his employment.   AC ¶¶ 14-15.   That is not a fair reading of the provision she cites, which when read in full provides:

> <u>Clearly identify your *institutional communications*</u>:   In some cases, individuals
> maintain several social media outlets, with some for personal use and others for

---

[7] The Guidelines make clear that they apply to community members "authorized to speak on behalf of the University's Central Administration."   *See id.* at 1, para. 5.   *See also id.* para. 7 ("[I]ndividuals authorized to speak for Harvard"); *id.* par. 11 ("[M]embers who are authorized to speak on behalf of the University through social media"); *id.* at 3, para. 5 ("[H]ere are some principles to guide individuals authorized to use social media to speak on Harvard's behalf"); id. at 5, para. 2 (You "should only post on behalf of Harvard or its schools and units in an official capacity where you have been explicitly authorized to do so").

official Harvard business.  Individuals must use care to separate the two uses and *avoid using Harvard outlets to distribute personal communications*. Unless specifically authorized to speak on behalf of Harvard or a University department, school or unit, you must state that the views expressed are your own.  On Twitter, for example, *you might consider* using a disclaimer in the account profile's "Bio" section: "Tweets are my own and do not reflect the views of my employer."

*Id.* (Dkt. 10-2) at 7-8.

Benton, of course, was not "using Harvard outlets to distribute personal communications." He was using his personal Twitter account, not that of the Nieman Lab or any other Harvard entity. The Guidelines' advice that he "might consider" using a disclaimer saying that the views stated in his tweets were his own did not mean that he was required to do so, nor does it compel the legal conclusion that, absent such a disclaimer, his tweets were within the scope of his employment. Because the Guidelines were "not intended to govern or restrict personal presence on the web," *see id.* at 2, they shed no light on whether Benton's personal tweets were within the scope of his employment.

Ironically, Prof. Viola alleges that she "was not subject to any restrictions concerning her use of online platforms outside of the [Temple University] workplace to express her opinions *under her own name or through a pseudonym*."  AC ¶ 10 (emphasis added).  Her complaint fails to plausibly allege that Benton's use of his personal Twitter account should be subject to a different standard.  Because Prof. Viola fails to allege a *prima facie* case of personal jurisdiction against Harvard with respect to her tort claims, the amended complaint should be dismissed.  *See generally Kramer*, 1994 U.S. Dist. LEXIS 13077, at *46 ("To hale Harvard into Court in this jurisdiction would be solely the result of 'random,' 'fortuitous,' or 'attenuated' contacts, or on the basis of the 'unilateral activity of another party or a third person.'") (citations omitted).

### B.    The Complaint Fails to State a Claim Upon Which Relief May Be Granted.

Apart from and in addition to the lack of personal jurisdiction over Harvard, the complaint

fails to state a claim upon which relief may be granted.  To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The complaint must support "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Pleading facts that are "merely consistent with a defendant's liability ... stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In evaluating a complaint's sufficiency under these standards, a court must first "tak[e] note of the elements a plaintiff must plead to state a claim." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675).  The court then should "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Applying this standard, and accepting Prof. Viola's well-pleaded allegations as true for Rule 12(b)(6) purposes, the complaint fails to state a claim upon which relief may be granted.  *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (court need not accept a plaintiff's "bald assertions" or "legal conclusions") (citations omitted).

As a threshold matter, as shown in § A(2)(b), *supra*, the amended complaint fails to plausibly allege that Benton's tweets about Prof. Viola were published within the scope of his employment by Harvard.  The amended complaint therefore fails to state any viable claim in tort against Harvard, which is not alleged to have itself engaged in any tortious behavior.  Counts I-V and VIII and IX can and should be dismissed on that basis alone.  Even if an analysis of the merits of each claim is undertaken, however, the amended complaint fails to state any legally viable claim

against Harvard for the reasons set forth below.

### 1.   The Complaint Fails to State a Claim for Intrusion Upon Seclusion.

To establish a claim for intrusion upon seclusion, Prof. Viola must prove that defendants invaded her privacy: "(1) by physical intrusion into a place where the Plaintiff has secluded [herself], (2) by use of the defendant's senses to oversee or overhear the Plaintiff's private affairs, or (3) some other form of investigation or examination into Plaintiff's private concerns." *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 571-72 (W.D. Pa. 2015) (quoting *Harris by Harris v. Easton Pub. Co.*, 335 Pa. Super. 141, 483 A.2d 1377, 1383 (1984) (quoting *Restatement (Second) of Torts* § 652B, comment b)).

When analyzing intrusion claims, Pennsylvania courts rely on the definition of the tort set forth in *Restatement (Second) of Torts*, which provides:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Restatement (Second) of Torts* § 652B (1977).  *See Burger v. Blair Medical Associates*, 964 A.2d 374, 379 (Pa. 2009) (quoting § 652B); *see also Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004); *Gabriel*, 124 F. Supp. 3d at 571.

"An action [for intrusion] does not depend upon any publicity given to the person whose interest is invaded or to his affairs."  *Harris*, 483 A.2d at 1383.  As the *Restatement* explains:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires.  It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

*Restatement (Second) of Torts* § 652B, cmt. b.

As a matter of law, there is no intrusion if the defendant had the right to view or obtain the information at issue.  In *Burger*, for example, a health care provider disclosed a patient's medical information to the patient's employer.  964 A.2d at 375.  Because the health care provider "legitimately obtained this information as part of [the plaintiff's treatment]," the Pennsylvania Supreme Court held that "the theory of 'intrusion upon seclusion,' which requires an intentional and unwarranted acquisition by the defendant, … is inapplicable." *Id.* at 379 (citing *Restatement (Second) of Torts* § 652B).  The health care provider's subsequent disclosure of the patient's medical records, although relevant to the plaintiff's alternative claim for publication of private facts, did not give rise to a claim for intrusion upon seclusion. *Id.* at 379-80.  *See also O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989) (intrusion requires an actor to "believ[e], or [be] substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act"); *Gabriel,* 124 F. Supp. 3d at 572 (no intrusion claim where the personal information in question was "voluntarily provided" to the defendant).

In this case, Prof. Viola's intrusion claim fails because, as she concedes, "[i]n his capacity as Director of Nieman Lab, Benton had administrative access to view Viola's email address associated with [her] comment posted to the [Nieman Lab] Article." AC, ¶ 38.  *See also id.* ¶ 21 (the "email address of users who comment on websites using Disqus is accessible by the website administrators").  *See generally Smyth v. Pillsbury Co.*, 914 F. Supp. 97, 101 (E.D. Pa. 1996) (there is "no reasonable expectation of privacy in unprofessional e-mail communications voluntarily made by an employee to his supervisor over the company e-mail system *notwithstanding any assurances that such communications would not be intercepted by management*") (emphasis added); *Hard Drive Prods. v. Does 1-48*, No. 11 CV 9062, 2012 WL 2196038, at *4 (N.D. Ill.

June 14, 2012) ("[C]ourts have recognized that because internet subscribers must convey their identity and other information to an ISP in order to establish an account, they do 'not have a reasonable expectation of privacy in their subscriber information.'") (citations omitted).  Benton's use of his administrative access to view Prof. Viola's email address simply is not comparable to Harvard "forc[ing] [its] way into [her] room in a hotel," "looking into [her] upstairs windows with binoculars," "opening [her] private and personal mail," or any other recognized form of intrusion upon seclusion.  *Restatement (Second) of Torts* § 652B, cmt. b.

The amended complaint also does not allege that Prof. Viola suffered any injury from Benton *accessing* her email address.  Nor could it.  Standing alone, that act caused her no conceivable harm.  Her alleged damages arose from Benton *publishing* the information he obtained.  *See* AC, ¶ 44 (Benton "publish[ed] a string of harassing and disparaging statements about [Prof. Viola] to his Twitter account … which revealed her identity in association with the Truthseeker Account"); *id.* ¶ 62 ("Benton's doxing of Viola also drew immediate media attention[.]").  As in *Burger*, so too here, Prof. Viola's claim that Benton wrongfully disclosed information he obtained as Director of the Neiman Lab does not state a claim for intrusion upon seclusion.  600 Pa. at 203, 964 A.2d at 379.  *See also Bowley v. City of Uniontown Police Dept.*, 404 F.3d 783, 787 n.5 (3d Cir. 2005) ("[W]hether the defendant's subsequent disclosure of the information violated section 6308 is irrelevant to the question of whether the newspaper lawfully obtained the information it disclosed"); *Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) ("[A] plaintiff fails to state a claim for invaded seclusion if the harm flows from publication rather than the intrusion."); *Pearson v. Dodd*, 410 F.2d 701, 705–06 (D.C. Cir. 1969) ("[I]n analyzing a claimed breach of privacy, injuries from intrusion and injuries from publication should be kept clearly separate."); *Karraker v. Rent-A-Center, Inc.*, 239 F. Supp. 2d 828, 838 (C.D. Ill. 2003)

("The key distinction of this privacy tort is that the injury stems from the intrusion itself and not from any publication.") (citation omitted).  Because Benton lawfully accessed Prof. Viola's email address, and because doing so caused Prof. Viola no injury, her intrusion claim against Harvard fails as a matter of law and should be dismissed.

### 2.    The Complaint Fails to State a Claim for Publication of Private Facts.

The elements of a publication of private facts claim under Pennsylvania law are: "1) giving publicity; 2) to private facts; 3) of a kind highly offensive to a reasonable person; and 4) *which are not of legitimate concern to the public*."  *Bowley*, 404 F.3d at 778 n.7 (emphasis in original).  *See also Jenkins v. Bolla*, 600 A.2d 1293, 1296 (1992); *Harris*, 483 A.2d at 1384.[8]

The requirement that the information at issue is not of legitimate concern to the public is mandated by both state law and the First Amendment.  "[S]peech on matters of public concern ... is at the heart of the First Amendment's protection."  *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (internal quotation marks and citations omitted).  *See also Thornhill v. Alabama*, 310 U. S. 88, 101-102 (1940) ("The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.").

As the Supreme Court has explained, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the

---

[8] Section 652D of the Restatement similarly provides:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
> (a)  would be highly offensive to a reasonable person, and
> (b)  *is not of legitimate concern to the public*.

*Restatement (Second) of Torts* § 652D (emphasis added).  *See Morgan v. Celender*, 780 F. Supp. 307, 308 (W.D. Pa. 1992) ("Pennsylvania adopted the tort of invasion of privacy, as set forth in Restatement (Second) of Torts, § 652.") (citation omitted).

community, …, or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'" *Snyder*, 562 U.S. at 453 (citations omitted). The "arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* (citation omitted). *See also Morgan*, 780 F. Supp. at 309-10 (under state law, "newsworthy items are included within the scope of matters of legitimate public concern," as is the "publication of matters of genuine popular appeal"). *See generally Jenkins*, 600 A.2d at 1296.

In *Snyder*, for example, a religious group that believed the United States was overly tolerant of sin and that as a result God killed American soldiers as punishment, picketed a soldier's funeral service. 562 U.S. at 447. The group's placards contained statements such as "God Hates the USA/Thank God for 9/11," "Semper Fi Fags," "God Hates Fags," and "Thank God for Dead Soldiers." *Id.* at 454. While acknowledging that those messages "may fall short of refined social or political commentary," the Supreme Court ruled that "the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters of public import[.]" *Id.* Even though the group targeted a funeral, and even if some of the signs were viewed as conveying messages related "specifically" to the decedent and his family, "that would not change the fact that the overall thrust and dominant theme of [the group's] demonstration spoke to broader public issues." *Id.* Because the "content" of the statements "plainly relate[d] to broad issues of interest to society at large, rather than matters of 'purely private concern,'" the First Amendment shielded the speakers from tort liability to the decedent's grieving father. *Id.* at 454-55. As the *Snyder* Court concluded:

> Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot

react to that pain by punishing the speaker.  As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate.  That choice requires that we shield [the defendant] from tort liability for its picketing in this case.

*Id.* at 460-61.

The district court for the Western District of Pennsylvania reached a similar conclusion in *Morgan v. Celender*, 780 F. Supp. 307 (1992).  Despite a reporter's promise of confidentiality, the defendant newspaper in *Morgan* published the identities of a mother and her children in an article about criminal charges brought against the children's father for sexual abuse.  *Id.* at 309-10.  The court ruled that because the "personal facts supplied by plaintiffs to the reporter that were inserted in the article … related to an issue of legitimate concern to the public," the publication of private facts claim failed as a matter of law.  *Id.* at 310.  "[I]t matter[ed] not … that the information and photograph may have been obtained illegally, unethically or deceptively by the reporter."  *Id.*

*Snyder* and *Morgan* demonstrate that whether information is of legitimate concern to the public depends on the content of that information, not the manner in which the information was obtained or how and where it was disseminated.  *See also Smith v. Borough of Dunmore*, 633 F.3d 176, 182 (3d Cir. 2011) ("The information's existence in a personnel file [disclosed by a confidential source] does not affect the public's interest in it, and we do not accept the premise that employment information is not of public concern when it pertains to a firefighter's qualifications to be employed in the first place."); *Manion v. Sarcione*, 192 F. Supp. 2d 353, 357 (E.D. Pa. 2001) ("However unfortunate disclosure may be to any of the persons involved, a criminal investigation [of a student's complaint against a teacher] and its results are matters in which the public and particularly the school Principal here had a genuine interest"); *Pearson*, 410 F.2d at 705-06 ("in analyzing a claimed breach of privacy, injuries from intrusion and injuries from publication should be kept clearly separate").

By Prof. Viola's own account, she is an "award winning, respected journalist and journalism professor[.]"  AC, ¶ 1.  During her "successful career with Temple," she "cultivated a stellar reputation in the Temple community," including by earning a faculty merit award for exceptional performance on April 23, 2018, less than two weeks before Benton's tweets.  *Id.*, ¶¶ 1, 9.  Her career accomplishments included working as a writer and associate producer for KYW-TV Eyewitness News (now CBS-3), being part of an Emmy Award-winning news team, specializing in legal news reporting, and working for ABC's *World News Tonight* and *Good Morning America* before joining the faculty at Temple.[9]

Prof. Viola's position as a journalism professor at Temple University, a publicly funded educational institution that is part of the Commonwealth System of Higher Education, strengthens the public interest in her views on journalism.  "[E]ducation is perhaps the most important function of state and local governments."  *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954).  Indeed, "public school teachers may be regarded as performing a task 'that go[es] to the heart of representative government.'"  *Ambach v. Norwick*, 441 U.S. 68, 75-76 (1979) (citations omitted) (brackets in original).

> Alone among employees of the system, teachers are in direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school.  In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way the course material is communicated to students.  They are responsible for presenting and explaining the subject matter in a way that is both comprehensible and inspiring.  No amount of standardization of teaching materials or lesson plans can eliminate the personal qualities a teacher brings to bear in achieving these goals.  Further, a teacher serves as a role model for his students, exerting a subtle but important influence over their perceptions and values.  Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of

---

[9] *See* https://klein.temple.edu/faculty/francesca-viola (last visited on April 29, 2020) (copy attached as Exhibit B to Motion to Dismiss).  *See also* n. 2, *supra* (court may take judicial notice of undisputed facts in ruling on a motion to dismiss and consider matters referenced in plaintiff's complaint).

students toward government, the political process, and a citizen's social responsibilities.

*Id.* at 78-79. Applying similar reasoning, courts in several jurisdictions have held that public school teachers are public officials for First Amendment purposes. *See, e.g.*, *Kelley v. Bonney*, 606 A.2d 693, 710 (Conn. 1992) ("Robust and wide open debate concerning the conduct of the teachers in the schools of this state is a matter of great public importance.").[10] *See generally Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) (debate about public officials should be "uninhibited, robust, and wide-open" and "may well include vehement, caustic, and sometimes unpleasantly sharp attacks . . . . ") (citation omitted).[11]

Temple University's Mission Statement provides that the University "open[s] [its] doors to a diverse community of learners and scholars who strive to make the possible real" and is committed to "creating a collaborative community of outstanding faculty and staff who foster inclusion and encourage the aspirations of Temple students."[12] Benton reported that a Temple University journalism professor nevertheless had (a) complained that the *Philadelphia Inquirer* failed to publish an adequate number of comments on "stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments," and (b) promoted conspiracy theories that Hillary Clinton and/or the DNC committed murder and that President Trump had won the popular vote.[13] Given the

---

[10] *See also Basarich et al., v. Rodeghero, et al.*, 321 N.E.2d 739 (Ill. App. Ct.1974); *Johnston v. Corinthian Tele. Corp.*, 583 P.2d 1101, 1103 (Okla. 1978); *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 56 (Minn. Ct. App. 1995); *Luper v. Black Dispatch Pub. Co.*, 675 P.2d 1028, 1031 (Okla. Civ. App. 1984); *Sewell v. Brookbank*, 425, 581 P.2d 267, 270 (Ariz. Ct. App. 1978).

[11] This Court need not address whether Prof. Viola's position as a public university teacher made her a public figure in order to recognize that her position made her "truthseeker" posts a matter of legitimate public interest, such that publication is not an actionable invasion of privacy.

[12] *See* https://secretary.temple.edu/sites/secretary/files/policies/01.10.02.pdf (last visited on April 30, 2020) (copy at Exhibit C to Motion to Dismiss).

[13] *See* Motion to Dismiss, Exhibit A at A-3, A-5 to A-7; Complaint, Exhibit K at 3 (Dkt. 10-11).

significant public interest in education and public educators, Benton's commentary about the provocative comments and critiques of journalism Prof. Viola posted as "truthseeker"—comments in which she identified herself as a journalism professor with a law degree who was teaching at a major east coast university—were of legitimate concern to the public.

To paraphrase Prof. Viola, "although [she] may find [Benton's] opinions uncomfortable and even repulsive, the First Amendment protects those opinions[.]"  Motion to Dismiss, Exhibit A at A-6.  The views Prof. Viola expressed on important journalistic issues are directly relevant to the public's assessment of the performance of her professional duties at a public university, a newsworthy subject of legitimate public interest.  Her publication of private facts claims therefore are barred as a matter of law.  *See Snyder*, 562 U.S. at 454-55 (speech that "may fall short of refined social or political commentary," but which highlights the political and moral conduct of the citizens, "are matters of public import" that "plainly relat[e] to broad issues of interest to society at large, involves "matters of 'purely private concern.'") (citation omitted); *Morgan*, 780 F. Supp. at 309-10 ("[N]ewsworthy items" and the "publication of matters of genuine popular appeal" are matters of legitimate public concern); *Borough of Dunmore*, 633 F.3d at 182 (information that firefighter allegedly failed to complete required training was matter of legitimate public interest).[14]

### 3.    Plaintiff's False Light Invasion of Privacy Claim Should Be Dismissed.

Plaintiff's false light claim fails for several independent reasons.  First, as the Third Circuit held in *Borough of Dunmore*, an essential element of a false light claim under Pennsylvania law is

---

[14] Prof. Viola's citations to Harvard publications involving anonymous speech are misplaced.  *See* AC, ¶ 31.  The First Amendment's restraints on the government's power to compel the disclosure of anonymous speakers do not apply to private actors such as the defendants and, in all events, are less rigorous than prohibitions on speech.  *See generally Doe v. Reed*, 561 U.S. 186, 196 (2010) ("[D]isclosure requirements may burden the ability to speak, but they … do not prohibit anyone from speaking." (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010)).

proof that the information made public was not a matter of public concern.  633 F.3d at 182; *see also Rush v. Phila. Newspapers, Inc.*, 732 A.2d 648, 654 (Pa. Super. 1999) (listing "not of legitimate concern to the public" as an element of a false light claim) (citation omitted).  As shown in § B(2), *supra*, the contents of Benton's tweets were of legitimate concern to the public, thus also precluding her false light claim as a matter of law.

A separate ground for dismissal is that "the false-light tort requires actual malice," *i.e.*, proof that the defendant either knew that the statements were false or published with "reckless disregard" for the truth.  *McCafferty*, 955 F.3d at 359-60; *Graboff*, 744 F.3d at 136; *Time, Inc. v. Hill*, 385 U.S. 374, 387-88, 390 (1967).[15]

The actual-malice test is a subjective inquiry into the defendant's state of mind. A statement made with actual malice is one made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U. S. 254, 280 (1964). The "reckless disregard" component of actual malice has been further defined to mean that the defendant "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or acted with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

---

[15] The *Restatement (Second) of Torts* defines false light invasion of privacy as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Restatement (Second) of Torts* § 652E.

The "failure to check sources, or negligence alone, is simply insufficient" to prove actual malice. *Tucker v. Phila. Daily News*, 848 A.2d 113, 135 (Pa. 2004); *see also Joseph v. Scranton Times, L.P.*, 129 A.3d 404, 439-40 (Pa. 2015) (violation of journalistic standards and newspaper's internal procedures is insufficient to prove actual malice); *Sprague v. Walter*, 543 A.2d 1078, 1084 (Pa. 1988) (to establish actual malice, the plaintiff's burden "requires more than a consideration of whether a reasonably prudent man would have published the article without further investigation, but rather requires the presentation of sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.") (quotation marks and citation omitted); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-11 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.") (citation omitted); *McCafferty*, 955 F.3d at 359 ("Actual malice is a term of art that does not connote ill will or improper motivation.").

The amended complaint fails to plausibly allege that Benton knew his tweets were false or entertained serious, subjective doubts as to their accuracy. To the contrary, the pleading alleges that Benton discovered Prof. Viola's identity and her association with the "truthseeker" account and accurately ascertained that she had posted several of the comments as "truthseeker." AC, ¶¶ 39-41. Those allegations show that Benton had every reason to believe his tweets were accurate, and no reason to believe that they were false. Prof. Viola's defamation and defamation by implication claims thus should be dismissed for failing to plausibly allege actual malice, an essential element of the claims. *See McCafferty*, 955 F.3d at 359-60 (affirming dismissal of complaint for failure to plausibly allege actual malice).

Finally, as the *McCafferty* Court held, "[i]n Pennsylvania, falsity means the same thing for false light as it does for defamation."  955 F.3d at 360 (citing *Graboff v. Colleran Firm*, 744 F.3d 128, 137 (3d Cir. 2014)).  Because (as shown below) Benton's tweets were substantially true, the false light claim must be dismissed.  *See* § B(4)(b), *infra*.

### 4.    Plaintiff's Defamation and Defamation by Implication Claims Should Be Dismissed.

 In order to state a claim for defamation, a plaintiff must plausibly allege, *inter alia*, that the defendant published a materially false and defamatory fact about the plaintiff and did so either with actual malice (in the case of a public official plaintiff) or negligently (in the case of a private figure plaintiff).  *Dunlap v. Phila. Newspapers, Inc.*, 448 A. 2d 6, 10, 13-14 (Pa. Super. 1982); *Hepps v. Phila. Newspapers*, 485 A.2d 374 (Pa. 1984), *rev'd on other grounds*, 475 U.S. 767 (1986).  The amended complaint fails to plausibly allege these essential elements.

#### a.    Benton's Tweets Are Not Defamatory.

It is the function of the court, in the first instance, to determine whether a statement is reasonably capable of a defamatory meaning.  *Dunlap.* 448 A.2d at 10.  "It is not enough that the victim of 'slings and arrows of outrageous fortune' be embarrassed or annoyed, he must have suffered that kind of harm which has grievously fractured his standing in the community of respectable society."  *Scott-Taylor, Inc.* v. Stokes, 229 A.2d 733, 734 (Pa. 1967).

Prof. Viola claims that Benton's tweets implied that she was "a racist and islamophobic" and therefore are defamatory.  This claim is barred for the reasons recently stated by the Third Circuit Court of Appeals in *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352 (3d Cir. 2020).  The plaintiff in *McCafferty* was a 12-year-old boy who was an avid supporter of then-presidential candidate Donald Trump.  *Id.* at 354.  He sued for defamation and false light invasion of privacy based upon an article that described his public appearances, and those of another young Trump supporter, as "camouflage" positions of the hard right that were "defending raw racism and

sexual abuse." *Id.* at 354-56. The Third Circuit affirmed the district court's dismissal of the complaint, holding that the article was not defamatory and that the offending language was protected opinion based on facts disclosed in the article. *Id.* at 357-60.

The *McCafferty* Court ruled that "[i]n Pennsylvania, 'a simple accusation of racism'" is not enough to support a defamation claim. "Rather, the accusation must imply more, by for instance suggesting that the accused has personally broken the law to 'act[] in a racist manner.'" *Id.* at *10 (citing *MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117, 674 A.2d 1050, 1055 (Pa. 1996) (brackets in original)). In language fully applicable to Prof. Viola's claims, the Court concluded:

> We see no evidence that Pennsylvania would let defenders of those accused of bigotry or crime bring defamation actions whenever a publication mentions their defense.

*McCafferty*, 955 F.3d at 358 (citations omitted).

*McCafferty* is fatal to Prof. Viola's defamation by implication claim. Just as a "simple accusation of racism" is not defamatory under Pennsylvania law, the amended complaint's allegation that Benton created the false impression that Prof. Viola is "a racist and islamophobic" is not actionable as a matter of law. *See, e.g.*, AC, ¶ 104. *See also Sweeney v. Phila. Record Co.*, 126 F.2d 53, 55 (3d Cir. 1942) (dismissing complaint on grounds that "[a]t the most the appellant is charged with being a bigoted person who, actuated by a prejudice of an unpleasant and undesirable kind, opposed a foreign born Jew for a judicial appointment."); *McAndrew v. Scranton Repub. Pub. Co.*, 364 Pa. 504 511 (1950) ("It would doubtless be very annoying for a man to be charged with bigotry of any kind, yet it has been held that for a man to be charged with such bigotry is not defamation.") (citation omitted); *Raible v. Newsweek, Inc.*, 341 F. Supp. 804 (W.D. Pa. 1972) ("We hold that to call a person a bigot or other appropriate name descriptive of his political,

racial, religious, economic or sociological philosophies gives no rise to an action for libel.").[16]

> **b.       Benton's Tweets Are Substantially True.**

"In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986), the Supreme Court held that in a defamation action where the alleged defamatory statements are a matter of public concern, the plaintiff must prove … the falsity of the allegedly defamatory statements." *Wilson v. Slatalla*, 970 F. Supp. 405, 422 (E.D. Pa. 1997).  *See also Morgenstern v. Fox Television Stations of Phila.*, No. 08-0562, 2008 WL 4792503, at *9 (E.D. Pa. Oct. 31, 2008) (under *Hepps*, libel plaintiff bears burden of proving falsity where statements are of public concern).

"Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"  *Masson*, 501 U.S. at 517 (citation omitted).  "The truth required is not complete truth but rather substantial truth." *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F. 3d 1309, 1316 (3d Cir. 1994).  "[T]he test is whether the [alleged] libel as published would have a different effect on the mind of the reader from which the pleaded truth would have produced." *Keeshan v. Home Depot, U.S.A., Inc.*, No. 00-529, 2001 U.S. Dist. LEXIS 3607, *53-54 (E.D. Pa. Mar. 27,2001), *aff'd*, 35 F. App'x 51 (3d Cir. 2002) (internal quotation marks and citations omitted); *see also ToDay's Housing v. Times Shamrock Commc'ns*, 21 A.3d 1209, 1215 (Pa. Super. 2011) ("The law does not require perfect truth, so long as any inaccuracies do not render the substance and 'gist' of the statements untrue."); *Hojnowski v. Reading Eagle Co.*, No. 06-4407, 2007 Pa. D. & C. Dec. LEXIS 205, at *6 (Ct. Com. Pl. Berks Cty. June 5, 2007) (newspaper article erroneously reporting plaintiff was convicted of one drug offense when he was convicted of another is not defamatory).

---

[16] *See generally Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1262-63 (2010) ("We agree that general statements charging a person with being racist, unfair, or unjust—without more— … constitute mere name calling and do not contain provably false assertions of fact.") (citation omitted).

The amended complaint concedes that Benton's tweets *accurately* identified her as the "truthseeker." *See* AC, ¶ 41 ("Benton was also able to identify previous anonymous comments posted using the same Truthseeker Account"); *id.* ¶ 44 (Benton "revealed her identity and associated her with the Truthseeker account"); *id.* ¶ 69 (Benton "discover[ed] the private fact of her true identity in association with the Truthseeker Account"); *id.* ¶ 72 ("The subject of the comments published by the Truthseeker Account was a matter of private opinion and was not a matter of public concern"). Indeed, the very basis of Prof. Viola's publication of private facts claim is that Benton's tweets about those "truthseeker" comments were *true*. *See Restatement (Second) of Torts* § 565D, Special Note on Relation of § 652D to the First Amendment to the Constitution ("This Section provides for tort liability involving a judgment for damages for publicity given to *true statements of fact*.") (emphasis added).

Prof. Viola thus concedes that Benton accurately reported that she had made the following statements:

> I've been tracking your pattern of not allowing comments on any stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments.

> I watch Hannity and he is absolutely right about this Seth Rich thing. You are obviously a bitter democrat who doesn't want to face up to the fact that the DNC is corrupt, and like Hillary will do anything to preserve power…even murder.

> Seth Rich leaked the DNC plot to sabotage Bernie to Wikileaks. The DNC had him killed. This Russia story was manufactured as a distraction. You stupid libs keep pushing the Russian narrative with not one shred of evidence.

> Just like we learned eventually that the democrat talking points about the Benghazi murders being caused by an anti-Muslim video were a lie, the democrat attempt to deflect from corruption and murder saying "the Russians did it" will be proven to [be] yet another lie.

> And save your tired breath on the tired refrain that Hillary won the popular vote because of some illegal votes cast in California. Yawn.

> Has Drudge sold the franchise to a lib? The headlines and links are prolib. Reading

Zero Hedge now, not Drudge.[17]

*See* AC, Exhibit K (Dkt. 10-11); Motion to Dismiss, Exhibit A at A-1-4; A-6-7.

The only "truthseeker" comment tweeted by Benton that Prof. Viola (belatedly) denies making is the Gateway Pundit comment about Muslims: "Scum.  Deport them.  They hate us.  Get rid of them."  *Id.* ¶¶ 52-53; *see also* Motion to Dismiss, Exhibit A at A-5.  The "gist" or "sting" of that comment, however, is not materially different from the *Philadelphia Inquirer* comments which Prof. Viola admits making.  In those comments, Prof. Viola chastised the newspaper for not publishing more "comments on any stories that involve race[.]"  *Id.* at A-6.  She also criticized the perceived suppression of comments about "crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments." *Id.*.  The "gist" or "sting" of these statements calling for more comments about "Black on Black" crime, and her advocacy for expressing anti-Muslim and anti-immigrant viewpoints, are not materially different from the "truthseeker" comments in Gateway Pundit urging the removal of Muslim immigrants.  *See* Complaint, ¶ 51(d) ("She's also not a particular fan of Muslims, it seems[.]").  *See also Hojnowski*, 2007 Pa. D. & C. Dec. LEXIS 205, at *6 (newspaper article erroneously stating that plaintiff was convicted of one drug offense when he was convicted of another is not actionable); *see also Bustos v. A & E Television Networks*, 646 F.3d 762, 769 (10th Cir. 2011) (article falsely reporting that plaintiff was a member of the Aryan Brotherhood gang that required members to commit a murder as a condition to induction was substantially true where plaintiff had committed a gang-related murder in the past); *Houston v. State Bd. of Educ.*, No. 1

---

[17] *See generally* Bloomberg News, "Zero Hedge Permanently Suspended From Twitter for 'Harassment'" (January 31, 2020) (available at https://www.bloomberg.com/news/articles/2020-02-01/zero-hedge-permanently-suspended-from-twitter-for-harassment); NBC News, "Google bans website ZeroHedge from its ad platform over comments on protest articles [-] A Google spokesperson said in an email that it took action after determining the website violated its policies on content related to race" (June 16, 2020) (available at https://www.nbcnews.com/tech/tech-news/google-bans-two-websites-its-ad-platform-over-protest-articles-n1231176).

CA-CV 11-0617, 2013 Ariz. App. Unpub. LEXIS 325, at *2 (Ct. App. Ariz. Mar. 26, 2013) (statement that applicant for teaching position had made "stereotyped statements about racial groups" by calling Navajo people "stupid superstitious people" was substantially true where plaintiff had described Navajo people as "highly superstitious" but not "stupid").  Even assuming, therefore, that Prof. Viola did not post the anti-Muslim comment on Gateway Pundit, her criticism of the Philadelphia Inquirer for not printing more comments about "crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments" compels the legal conclusion that the gist or sting of Benton's tweets were true and therefore not actionable.  *See generally Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (plaintiff must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s] of his claim").

### c.    The Amended Complaint Fails to Plausibly Allege that Benton Acted with Actual Malice.

Because of her position as a prominent faculty member at a public university, Prof. Viola is a public official who must prove actual malice to prevail on a libel claim concerning the performance of her public duties.  *See Kelley*, 606 A.2d at 710; n.10, *supra*, and cases cited therein; *see generally Ambach*, 441 U.S. at 75-76.  As shown in § B(3), *supra*, because the amended complaint fails to plausibly allege actual malice, the false light claim fails for that independent reason.

### d.    The Amended Complaint Fails to Plausibly Allege that Benton Was Negligent.

Even if Prof. Viola is considered a private figure for purposes of her defamation and defamation by implication claims, she still is required to plausibly plead that Benton negligently published false and defamatory information about her.  *See Hepps,* 485 A.2d at 770, *rev'd on other grounds*, 475 U.S. 767 (1986); *Chicarella v. Passant*, 494 A.2d 1109, 1112 (Pa. Super. 1985).

The amended complaint does not (and cannot) plausibly allege negligence on Benton's part in investigating and publishing his tweets.  Prof. Viola concedes that Benton used a reliable investigative method—his administrative access as the Nieman Lab comment moderator—to view her email address and to accurately identify her as "truthseeker."  AC, ¶¶ 39-40, 69.  She does not allege, for example, that the Disqus records viewed by Benton were not contemporaneously created records kept in the ordinary course of business as a regular practice by Disqus.  *See* Fed. R. Evid. 803(6).  And she concedes that the records consulted by Benton correctly identified multiple comments she posted on the *Philadelphia Inquirer* website, the Breitbart News website, and other publications.  *Id.* ¶ 41 ("Benton was also able to identify previous anonymous comments posted using the same Truthseeker Account on other Disqus powered websites").  If indeed Prof. Viola did not make the Gateway Pundit comment posted under the Disqus account tied to her email address, Benton was not negligent in concluding that she had, and Prof. Viola alleges no facts to support the notion that he should have known otherwise.  Because the amended complaint concedes that Benton used a reliable method to identify the "truthseeker," any claim of negligence fails as a matter of law.

Nor can Prof. Viola claim that Benton was negligent for not contacting her before publishing his tweets.  Prof. Viola first complained to Harvard about Benton's tweets on July 18, 2018.  *See* Motion to Dismiss, Exhibit B (July 18, 2016 Demand Letter).  Although she filed her complaint in this action on March 16, 2020, it was not until she filed her amended complaint on June 12, 2020—over two years *after* Benton's tweets—that she first disclosed her claim of not having authored but one of the truthseeker comments cited by Benton.  Under these circumstances, any allegation that Benton reasonably could or should have obtained that information from Prof. Viola in May 2018 falls far short of a plausible claim of negligence on his part, requiring dismissal

of her defamation and defamation by implication claims. *See generally Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 114 (1st Cir. 2000) ("Reporters have leeway to draw reasonable conclusions from the information before them without incurring defamation liability.") (citation omitted).

> **5.    The Complaint's Derivative Claims for Intentional Infliction of Emotional Distress and Tortious Interference with Contractual Relations Should Be Dismissed.**

Prof. Viola's claims for intentional infliction of emotional distress and tortious interference with contractual relations, like her publication of private facts, defamation, and false light claims, seek to recover damages for Benton's disclosure of the comments Prof. Viola posted as "truthseeker." *See* AC, ¶ 129 ("Benton maliciously published the Twitter Statements"); *id.* ¶ 136 ("Benton intentionally and improperly interfered with Viola's existing relationship with her employer by unlawfully authoring and publishing the Twitter Statements without justification").

The Supreme Court's *Snyder* decision expressly held that statements of public interest protected by the First Amendment are not actionable as infliction of emotional distress claims. 562 U.S. at 460-61. *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (First Amendment prohibited recovery for emotional distress claim based on publication that failed to meet requirements for a defamation claim); *United States Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 931 (3d Cir. 1990) (First Amendment standards apply to non-defamation torts, including infliction of emotional distress) (citing *Hustler*, 485 U.S. at 56). *Jones,* 893 A.2d at 845-46 (infliction of emotional distress claim cannot be based on publication of statements of opinion not actionable as defamation).

The same requirements apply to interference claims. *See NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 891 & n.7, 918, 926 (1982) (reversing on First Amendment grounds liability for interference with plaintiffs' businesses); *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 109 (3d Cir. 1988) ("[T]he constitutional guarantees protecting speech against libel claims

retain their full force regardless of the nature of the cause of action") (citing *Hustler*, 485 U.S. 46); *Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 530 (3d Cir. 1998) (interference plaintiff must prove "absence of a privilege or justification on the part of the defendant"); *Walnut St. Associates v. Brokerage Concepts, Inc.*, 389, 20 A.3d 468, 479 (Pa. Super. 2010) ("[T]he conveyance of truthful information cannot reasonably be deemed to be 'improper' interference"); *Jones v. City of Phila.*, 73 Pa. D. & C.4th 246, 271-72 (2005) *aff'd*, 893 A.2d 837 (2006) (protected speech cannot form the basis for interference claim); *Neish v. Beaver Newspapers, Inc.*, 581 A.2d 619, 625  (Pa. Super. 1990) (publication of protected opinion was privileged and not actionable as interference with contractual relations).  The failure of Prof. Viola's publication claims requires that Counts VIII and IX of the complaint also be dismissed.

### 6.    The Complaint Fails to State a Claim for Breach of Contract.

"Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced."  *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 393, 123 A.2d 663, 666 (1956); *Linnet v. Hitchcock*, 324 Pa. Super. 209, 214, 471 A.2d 537, 540 (1984)).  "Additionally, of course, there must be consideration on both sides."  *Grossman*, 795 F.2d at 299 (citations omitted).  "Consideration 'confers a benefit on the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.'"  *Id.*  "Failure of consideration goes to the heart of any claim based upon an agreement and is always available as a defense to that claim."  *Peoples Mortg. Co. v. Fed. Nat'l Mortg. Ass'n*, 856 F. Supp. 910, 923 (E.D. Pa. 1994) (citing *M.N.C. Corp. v. Mt. Lebanon Medical Center, Inc.*, 510 Pa. 490, 509 A.2d 1256, 1259 (1986); *In re Levine's Estate*, 118 A.2d 741 (1955)).

Prof. Viola alleges that the terms of the Disqus Policies constitute a binding agreement between her and Harvard.  AC, ¶¶ 111-120.[18]  Yet there is no allegation Prof. Viola and Harvard exchanged with one another any consideration needed for the Disqus Policies to become an enforceable agreement.  The lack of either assent or consideration is fatal to any contract claim based on the Disqus Policies.

In all events, the terms of the Disqus Policies preclude Prof. Viola's contract claim.  The amended complaint cites the "Basic Rules for Disqus" as prohibiting users from "posting personally identifiable information."  AC, ¶ 24 (citing Exhibit F to AC).  But the very same section of the Basic Rules for Disqus expressly provides that "Real name isn't currently covered."  AC, Exhibit F at 1 (Dkt. 10-6).  And the Basic Rules for Disqus-Powered Sites (also relied upon by Prof. Viola, *see* AC, ¶ 22) expressly provide that the "Disqus Basic Rules" apply to all Disqus accounts, thus incorporating the "Real name isn't currently covered" provision quoted above.  Accordingly, even assuming that the Disqus Policies were an enforceable contract (despite the lack of any mutual assent or consideration), the complaint fails to allege that disclosing Prof. Viola's "real name" was a breach of contract.[19]

Prof. Viola also claims that Harvard's Privacy Statement constitutes a binding agreement between the parties.  By its terms, however, Harvard's Privacy Statement did not prohibit Benton from disclosing that Prof. Viola posted the "truthseeker" comments on the Nieman Lab website.  The Nieman Lab website contained a link to Harvard University's Privacy Statement, the very first paragraph of which prominently stated:

---

[18] Prof. Viola's breach of contract and promissory estoppel claims appear to be asserted solely against Harvard.  In all events, the complaint does not allege that Benton and Prof. Viola entered into any contract or that Benton made a promise of any kind to Prof. Viola.  *See* AC, ¶¶ 111-132.

[19] Prof. Viola's suggestion that an online dialogue from three years ago between an anonymous Disqus moderator and an anonymous Disqus user somehow impose binding contractual obligations on Harvard is meritless.  AC, ¶ 23 and Exhibit E (Dkt. 10-5).

> This Privacy Policy discloses the privacy practices for *www.harvard.edu, the main Harvard University website*.  Please note that Harvard Schools, Centers, and other Harvard units and affiliates have separate privacy policies.

AC, Exhibit G at 1 (Dkt. 10-7) (emphasis added).  The Statement also disclosed that the Harvard website "may contain links to other websites" and that Harvard was "not responsible for the privacy practices or the content of such websites."  *Id.* at 2 (Dkt. 10-7).

The language stating that "[y]our session and the *pages you visit on www.harvard.edu* will be tracked, but you will remain anonymous," underscored that the Privacy Statement applied only to users of www.harvard.edu, and not to users of the Nieman Lab website (https://www.niemanlab.org/).  *See Id.* at 1 (Dkt. 10-7) (emphasis added).  Because Prof. Viola posted on the Nieman Lab's website, not the "main Harvard University website" to which the Privacy Statement applied, she has no breach of contract claim.  *Id.*[20]

Finally, those who read the Privacy Statement (not just lawyers like Prof. Viola) would readily understand that it governed the *commercial* use by Harvard of users' information.  The Statement disclosed, for example, that Harvard might share user information with third-party vendors; that Google and other third parties may use cookies, web beacons, and similar technologies to collect information and use that information to provide target ads, but that Harvard would not "share, sell, rent, swap, or authorize any third party to use your email address *for commercial purposes* without your permission."  AC at 2, 3 (Dkt. 1-2 at 14, 15) (emphasis added).  As a matter of law, the plain terms of Harvard's Privacy Statement preclude Prof. Viola's breach of contract claim.

---

[20] Because the Privacy Statement by its terms applied only to Harvard and www.harvard.edu, there was no "browserwrap" agreement with Prof. Viola that governed her use of the Nieman Lab's website, www.niemanlab.org. *See* AC ¶ 29.

### 7.     The Complaint Fails to State a Claim for Promissory Estoppel.

The elements of promissory estoppel under Pennsylvania law are: "(1) the promisor made a promise that he or she could have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; (3) injustice can be avoided only by enforcing the promise." *Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003) (quoting *Crouse v. Cyclops Indus.*, 560 Pa. 394, 745 A.2d 606, 610 (2000)).

A promissory estoppel plaintiff cannot establish reasonable reliance in the absence of an express promise.  *See C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (promissory estoppel would be "rendered meaningless" if a plaintiff were allowed to maintain such an action based on the alleged existence of "a broad and vague implied promise.") (citation omitted); *see also TES Franchising, LLC v. Dombach*, No. 10-0017, 2010 WL 5071472, at *11 (E.D. Pa. Nov. 24, 2010) ("[T]here can be no justifiable reliance without an express promise*"*) (citations omitted); *Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408, 421 (W.D. Pa. 2009) (promissory estoppel requires "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel.") (quoting *Thomas v. E.B. Jermyn Lodge No. 2*, 693 A.2d 974, 977 (Pa. Super. 1997)).

Prof. Viola's promissory estoppel claim is entirely based upon Harvard's Privacy Statement.  *See* AC, Count VII, ¶¶ 121-27.[21]  As shown in the prior section, however, the Privacy Statement contains no "promise" that the Nieman Lab will not disclose the identity of users who

---

[21] As noted in § B(6), *supra*, the Basic Rules for Disqus expressly provide that "[r]eal name isn't currently covered" by the prohibition on posting personally identifiable information and therefore do not contain any promise on which Prof. Viola can rest a viable promissory estoppel claim.  AC, Exhibit G at 1 (Doc. 10-7).

post comments on the website.  To the contrary, the Statement prominently disclosed that it applied

only to www.harvard.edu, "the main Harvard University website," explicitly warned that "Harvard

Schools, Centers, and other Harvard units and affiliates [*i.e.*, the Nieman Lab] have separate

privacy policies," and that Harvard was "not responsible for the privacy practices or the content"

of other websites to which www.harvard.edu linked.  AC, ¶ 19; *id.*, Exhibit G at 1, 2 (Dkt. 10-7).

The Statement also disclosed that Harvard might share user information with third-party vendors.

This falls far short of the type of "express promise" needed to state a promissory estoppel claim.

*TES Franchising,* 2010 WL 5071472, at *11; *see also C & K Petroleum Prods., Inc.*, 839 F.2d at

192.

      The closest thing to an express "promise" made in the Privacy Statement was Harvard's

commitment that it would not "share, sell, rent, swap, or authorize any third party to use your email

address *for commercial purposes without your permission*."  AC, Exhibit G at 2, 3 (Dkt. 10-7)

(emphasis added).  But that provision is of no help to Professor Viola's promissory estoppel claim.

The complaint does not allege (nor could it) that any defendants shared Prof. Viola's email address

for a "commercial purpose."

      Prof. Viola's conclusory claim that she relied on an alleged promise of anonymity when

posting on the Nieman Lab website is further belied by her ubiquitous "truthseeker" comments on

other online publications.   For example, Prof. Viola posted a "truthseeker" comment on

Breitbart.com.  *See* AC, Exhibit G at 1 (Dkt. 10-7).  Breitbart's May 2017 Privacy Policy provided

in relevant part:

> The information, *including the personal information*, you provide to us *may be used
> for any purpose we deem appropriate* and *may be given or disclosed to* our
> affiliates, partners, vendors, advertisers, licensees and *third parties*.   You
> acknowledge that you understand when you disclose personal information ([e.g.],
> *name, email address*, zip code) on or in connection with your use of our services,

such information *can be monitored, collected and used by us or others and may result in unsolicited messages* from other users or third parties.

***

We may provide your information, including your personal information, to third parties, such as service providers, contractors and advertisers, for a variety of purposes, including, without limitation, for direct marketing purposes. *We reserve the right to disclose to third parties all of the information that we collect online about you and other visitors.*

*See* Motion to Dismiss, Exhibit D at 2 (emphasis added).[22]  Prof. Viola also posted "truthseeker" comments on the *Philadelphia Inquirer*'s website.  *See* Motion to Dismiss, Exhibit A at A-6.  The Inquirer's Terms of Purchase, Terms of Use, Privacy Policy, and Commenting Policy disclosed that the publication collects users' names, email address, and other information; uses the information it collects "for a *wide range of purposes*, including … *to attribute comments that you post on our Site or through SMS to you*," and that users "are agreeing to the terms and privacy of [a] third party service provider" through which some of the comments are posted.  *See* Motion to Dismiss, Exhibit E at 11, 12, 13 (emphasis added).[23]

Prof. Viola's conduct in posting "truthseeker" comments in publications that offered her no assurance of confidentiality further establishes that her conclusory allegation of relying on Harvard's Privacy Statement does not plausibly allege a promissory estoppel claim.  Because her claim is based on a "broad and vague implied promise," and is contradicted by the very terms of

---

[22] Exhibit D to the Motion to Dismiss, the May 2017 version of the Breitbart privacy policy, is available at https://web.archive.org/web/20170504041402/https://www.breitbart.com/privacy-policy.  The quoted language from the 2017 Breitbart privacy policy remains unchanged in the current version of the policy as of the date of this filing.

[23] Exhibit E to the Motion to Dismiss, the May 4, 2016 version of the *Philadelphia Inquirer*'s Terms of Purchase, Terms of Use, Privacy Policy, and Commenting Policy as available in December 2017, is accessible at https://web.archive.org/web/20171228000158/http://www.philly.com/philly/about/terms_of_use/442129623.html. This version of the policy was in effect when Prof. Viola posted the "truthseeker" comments on the Philadelphia Inquirer website referenced in the Complaint, *i.e.*, 8 months before Benton's May 4, 2018 Tweet.  *See* Motion to Dismiss, Exhibit A at A-6.

Harvard's Privacy Statement, Count VI fails as a matter of law and should be dismissed.  *See C &*

*K Petroleum Prods.*, 839 F.2d at 192.[24]

## IV.   CONCLUSION

Plaintiff's complaint against Harvard should be dismissed for lack of personal jurisdiction

or, in the alternative, for failure to state a claim upon which relief may be granted.

Dated: June 26, 2020                              Respectfully submitted,

*/s/ John P. Lavelle, Jr.*
John P. Lavelle, Jr. (I.D. No. 54279)
Lily G. Becker (I.D. No. 313508)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
Tel.:  215-963-5000
Fax:  215-963-5001
john.lavelle@morganlewis.com
lily.becker@morganlewis.com

Jonathan M. Albano (*pro hac vice forthcoming*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel.:  617-951-8360
Fax:  617-341-7701
jonathan.albano@morganlewis.com

*Counsel for Defendant President and Fellows of Harvard College (Harvard Corporation)*

---

[24] Harvard does not contend that it is constitutionally immune from promissory estoppel claims arising out of the publication of truthful information.  *See Cohn v. Cowles Media Co.*, 501 U.S. 663 (1991).  Rather, as shown above, Viola simply has failed to plausibly allege the elements of a promissory estoppel claim.