No. 2:20-CV-01439-NIQA

---

IN THE

# United States District Court for the Eastern District of Pennsylvania

———————————

FRANCESCA VIOLA,

*Plaintiff,*

V.

JOSHUA BENTON AND PRESIDENT
AND FELLOWS OF HARVARD COLLEGE
(HARVARD CORPORATION),

*Defendants.*

———————————

PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P 12(B)(2) AND 12(B)(6)

———————————

## TABLE OF CONTENTS

Table of Contents…………...…………………………………………………..…………………i.

Table of Authorities……………...………………………………………………………………iii

Introduction……………………….……………………………………………………………….1

Law and Argument………………………………………………………………………………...2

I.   This Court Has Jurisdiction Over Defendant Harvard…..…………….……………………2

    A.  Fed. R. Civ. P. 12(b)(2) Standard of Review………………..…………………………2

    B.  Harvard is Vicariously Liable for the Actions of its Employee, Joshua Benton……..…..3

        1.  Harvard is Vicariously Liable for Viola's Tort Claims and Subject to Jurisdiction in Pennsylvania………………………………………………………………...……4

        2.  This Court Has Jurisdiction to Adjudicate Viola's Contract Claims…..…………….....6

            a.  The Interactive Nature of the Neiman Lab Website Subjects Harvard to Jurisdiction in Pennsylvania…..…………………………………………..6

            b.  All of Viola's Claims Arise From the Same Nucleus of Operative Facts…..……7

II.  Viola Has Alleged Sufficient Facts to Sustain All of Her Claims……………………………9

    A.  Fed. R. Civ. P. 12(b)(6) Standard of Review…………………………………………...9

    B.  Viola's Allegations Have Remained Consistent and Consideration of Harvard's Extraneous Exhibits is Improper…………………………………………………………10

    C.  Viola Has Sufficiently Stated a Claim for Intrusion upon Seclusion……………………11

    D.  Viola Has Sufficiently Stated a Claim For Publication of Private Facts……………...15

    E.  Viola Has Sufficiently Stated Claims for Defamation and Defamation by Implication…17

        1.  Benton's Publication of the Gateway Pundit Comment About Muslims is Defamation Per Se…………………………………………………………………...17

        2.  Benton's Selective Publication of the Twitter Statements Constitutes Defamation by Implication…………………………………………………………………...19

F.  Viola Has Sufficiently Stated a Claim for False Light Invasion of Privacy and Has Sufficiently Alleged Actual Malice…………………………………………………...21

G.  Viola Has Sufficiently Stated a Claim for Breach of Contract…………………………..23

    1.  Benton Violated the Terms of the Harvard Privacy Statement Browsewrap Agreement…………………………………………………………………………23

    2.  Benton Violated the Terms of the of the Disqus Policies……………………………24

H.  Viola Has Sufficiently Stated a Claim for Promissory Estoppel………………………...26

I.  Viola Has Sufficiently Stated a Claim for Intentional Infliction of Emotional Distress...26

J.  Viola Has Sufficiently Stated a Claim for Tortious Interference with Contractual Relations………………………………………………………………………………27

Conclusion……………………………………………………………………………………28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Rules**

Fed. R. Civ. P. 12(b)(2)……………………………………………..………………1, 2, 28

Fed. R. Civ. P. 12(b)(6)…………………………………………………………1, 2, 9, 10, 28

**Cases**

*Abady v. Macaluso*,
    90 F.R.D. 690, 694 (E.D. Pa. 1981)…………………………………………………...14

*Aliota v. Graham,*
    984 F.2d 1350, 1359 (3d Cir. 1993)……………………………………………………5

*Alpart v. Gen. Land Ptnrs, Inc.*,
    574 F. Supp. 2d 491, 501 (E.D. Pa. 2008)……………………………………………23

*Atiyeh v. Nat'l Fire Ins. Co.,*
    742 F. Supp. 2d 591, 596 (2010)………………………………………………………9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570 (2007)………………………………………………………………9

*Berkery v. Equifax Info. Servs*.,
    429 F. Sup. 3d 24, 30 (E.D. Pa. 2019)…………………………………………10, 11

*Brokerage Concepts v. United States Healthcare,*
    140 F.3d 494, 530 (3d Cir. 1998)……………………………………………………...28

*Brumfield v. Sanders,*
    232 F.3d 376, 380-381 (3d Cir. 2000)…………………………………………………5

*Burger v. Blair Medical Assoc.,*
    964 A.2d 374, 379 (Pa. 2009)…………………………………………………………12

*Butler v. Flo-Ron Vending Co.,*
    383 Pa. Super. 633, 647, 557 A. 2d 730, 737 (1989)…………………………………...5, 6

*Campbell v. Mars, Inc.,*
    2016 U.S. Dist. LEXIS 161996, at *88 (E.D. Pa. Nov. 22, 2016)……………....……...9

*Carteret Savings Bank, FA v. Shushan,*
    954 F.2d 141, 146 (3d Cir. 1992)………………………………………………………2

*Crouse v. Cyclops Indus.*,
    560 Pa. 394, 403, 745 A.2d 606, 610 (2000)……………………………………………26

*Diaz v. D.L. Recovery Corp.*,
    486 F. Supp. 2d 474, 479-80 (E.D. Pa. 2007)……………………………………14

*Di Mark Mktg., Inc. v. Louisiana Health Serv.& Indemnity Co.*,
    913 F. Supp. 402, 405 (E.D. Pa. 1996)……………………………………………3

*D'Jamoos v. Pilatus Aircraft Ltd.*,
    566 F. 3d 94, 102 (2009)…………………………………………………………..3

*Doe v. Kohn Nast & Graf, P.C.*,
    1994 U.S. Dist. LEXIS 13476, at *5-6 (E.D. Pa. Sep. 20, 1994)…………...………...14

*Dunlap v. Phila. Newspapers, Inc.*,
    301 Pa. Super. 475, 482, 448 A.2d 6, 10 (1982)………………………………………...20

*Fitzgerald v. McCutcheon*,
    270 Pa. Super. 102, 106, 410 A.2d 1270, 1271 (1979)………………………………...4

*Fowler v. UPMC Shadyside*,
    578 F.3d 203, 210 (3d Cir. 2009)……………………………………………………….9

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012)……………………………………………...24

*Graboff v. Colleran Firm*,
    744 F.3d 128, 136 (3d Cir. 2014)………………………………………………………20

*HealthPlanCRM, LLC v. AvMed, Inc.*,
    2020 U.S. Dist. LEXIS 74187, at *45 (W.D. Pa. Apr. 28, 2020)………………………24

*Herbert v. Lando*,
    441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643, 60 L.Ed.2d 115, 126 (1979)…………..22

*Hoy v. Angelone*,
    456 Pa. Super. 596, 610 (1997)…………………………………………………………27

*Hunt v. Liberty Lobby*,
    720 F.2d 631, 643 (11th Cir. 1983)……………………………………………………22

*Hutchinson v. Proxmire*,
    443 U.S. 111, 135, 99 S. Ct. 2675, 2688, 61 L.Ed.2d 411, 431 (1979)…………………21

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310, 316 (1945)……………………………………………………………3

*In re Am. Airlines, Inc., Privacy Litig.,*
    370 F. Supp. 2d 552, 567 (N.D. Tex. 2005)………………………………………..24

*Joseph v. Scranton Times L.P.,*
    2008 PA Super 217, n.23, 959 322, 344 (2008) …………………………………...18

*Kedra v. Philadelphia,*
    454 F. Supp. 652, 667 (E.D. Pa. 1978)……………………………………………..13

*Larsen v. Phila. Newspapers, Inc.,*
    375 Pa. Super. 66, 81, 543 A.2d 1181, 1188 (1988)………………………………..20

*Masson v. New Yorker Magazine,*
    501 U.S. 496, 511, 111 S. Ct. 2419, 2430, 115 L.Ed.2.d 447, 469 (1991)……………18

*MacElree v. Phila. Newspapers,*
    544 Pa. 117, 674 A.2d 1050 (1996)………………………………………………...19

*McCabe v. Vill. Voice, Inc.,*
    550 F. Supp. 525, 529 (E.D. Pa. 1982)……………………………………………..15

*McCafferty v. Newsweek Media Group,*
    955 F.3d 352 (3d Cir. 2020)………………………………………………………...19

*McGuire v. Shubert,*
    722 A.2d 1087, 1092 (Pa. Super. Ct. 1998)………………………………………11, 13

*Mele v. Federal Reserve Bank of N.Y.,*
    359 F.3d 251, 255 n. 5 (3d Cir. 2004)……………………………………………..11

*Mzamane v. Winfrey,*
    693 F. Supp. 2d 442, 507 (E.D. Pa. 2010)…………………………………………22

*O'Connor v. Sandy Lane Hotel Co.,*
    496 F.3d 312, 317 (3d Cir. 2007)…………………………………………………..3

*Pelagatti v. Cohen,*
    536 A.2d 1337, 1343 (Pa. Super. 1988)……………………………………………28

*Schlichter v. Limerick Twp.,*
    2005 U.S. LEXIS 7287, at *39 (E.D. Pa. Apr. 26, 2005)………………………..15

*Speight v. Pers. Pool of Am., Inc.*,
    1993 U.S. Dist. LEXIS 9974, at *20 (E.D. Pa. Jul. 20, 1993)……………………………...15

*Snyder v. Phelps*,
    562 U.S. 443 (2011)……………………………………………………………...16, 17, 27

*TJS Brokerage & Co., Inc. v. Mahoney*,
    940 F. Supp. 784, 787 (E.D. Pa. 1996)……………………………………………………3

*Vangheluwe v. Got News, LLC*,
    365 F. Supp. 3d 850, 858-862 (E.D. Mich. 2019)………………………………………...3

*Vernars v. Young*,
    539 F.2d 966, 969 (3d Cir. 1976)………………………………………………………...14

*Weaver v. Lancaster Newspapers, Inc.*,
    592 Pa. 458, 471, 926 A.2d 899, 906 (2007)……………………………………...22, 23

*Wolfson v. Lewis*,
    924 F. Supp. 1413, 1419 (E.D. Pa. 1996)…………………………………………..11, 14, 15

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
    712 F.3d 165, 171 (3d Cir. 2013) ………………………………………………………10

*Zippo Mfg. Co. v. Zippo Dot Com*,
    952 F. Supp. 1119, 1124 (W.D. Pa. 1997)…………………………………….....6, 7

**Statutes**

28 U.S.C. § 1631……………………………………………………………………………..8


**Restatements**

Restatement (Second) of Agency § 228……………………………………………….......4

Restatement (Second) of Agency § 230…………………………………………………...5

Restatement (Second) of Torts § 652B……………………………………………....11, 13

Restatement (Second) of Torts § 652D……………………………………...………15

Restatement (Second) of Torts § 46……………………………………………………...27

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCESCA VIOLA | ) | Civil Action No. 2:20-CV-01439-NIQA |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civil Action No. 2:19-cv-01366 |
| | ) | |
| JOSHUA BENTON AND PRESIDENT | ) | |
| AND FELLOWS OF HARVARD | ) | *Electronically Filed* |
| COLLEGE (HARVARD | ) | |
| CORPORATION) | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED.R.CIV. 12(b)(2), and 12(b)(6)

Now comes Plaintiff Francesca Viola ("Viola"), by and through undersigned counsel, and hereby opposes Defendant President and Fellows of Harvard College's ("Harvard") Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(2), and Fed.R.Civ.P 12(b)(6).

## INTRODUCTION

Despite Harvard's attempt to cloud the record with extraneous exhibits and its own version of the facts, the case now before the Court is neither outside of its jurisdictional reach nor as complex as Harvard's lengthy motion to dismiss would have it seem. This case is about Viola's right to privacy, right to communicate pseudonymously on the Internet about her political beliefs, and whether a journalist, acting on behalf of his employer, may ruthlessly violate that right by abusing his duties as a website administrator. As discussed below, the answer is a resounding no.

When Professor Francesca Viola used the pseudonym "truthseeker" (the "Truthseeker Account") to publish a comment to an online Nieman Lab article on May 4, 2018, she had no idea that her personal and professional life was about to be turned upside down. Despite her attempt to preserve her privacy by using a pseudonym, and her understanding that her anonymity would be

maintained by the Nieman Lab website, she was blindsided by a vicious doxxing attack from Defendant Joshua Benton ("Benton")[1] after he read her comment and set out to inflict the maximum harm possible. Benton knowingly and maliciously used the weight and prestige of Harvard's name to attack and destroy the employment of a female professor who had been teaching and advancing the careers of primarily minority students for years at a state university in an urban setting. All of Benton's actions were taken in the course and scope of his employment by Harvard and Harvard is vicariously liable under the doctrine of respondeat superior. If the facts as alleged in Viola's Amended Complaint are true, then Defendants are liable for invasion of Viola's privacy, defamation, intentional infliction of emotional distress, tortious interference with Viola's employment contract and breaches of contractual promises made by Harvard.

In responding to Harvard's Motion to Dismiss, Viola, for the sake of efficiency, will not repeat the factual allegations of the Amended Complaint here, but incorporates them by reference in this Brief. Pl.'s Am. Compl., ECF No. 10. Viola has adequately stated her claims to survive the pending motion to dismiss this action under Fed.R.Civ. P. 12(b)(2) and (12)(b)(6).

## LAW AND ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER DEFENDANT HARVARD

### A.  Fed. R. Civ. P. 12 (b)(2) Standard of Review

When defending a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) the plaintiff is tasked with the burden of coming forward with sufficient facts to establish a prima facie case in favor of personal jurisdiction. *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 146 (3d Cir.

---

[1] Harvard's counsel waived service on behalf of both defendants on April 7, 2020 but has thus far only entered an appearance on Harvard's behalf. Benton has yet to answer or otherwise respond to Viola's Complaint or Amended Complaint. The Court should presume Benton's silence as his acquiescence to jurisdiction and his waiver of any opposition to each claim under Rule 12(b)(6).

1992).  Any conflict of facts between the plaintiff and defendant are to be resolved in favor of the plaintiff. *TJS Brokerage & Co., Inc. v. Mahoney*, 940 F. Supp. 784, 787  (E.D. Pa. 1996); *Di Mark Mktg., Inc. v. Louisiana Health Serv.& Indemnity Co*., 913 F. Supp. 402, 405 (E.D. Pa. 1996).

To establish the existence of personal jurisdiction over Harvard, the Court must "ask whether, under the Due Process Clause, [Harvard] has 'certain minimum contacts with [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *D'Jamoos v. Pilatus Aircraft Ltd.,* 566 F.3d 94, 102 (3d Cir. 2009) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Personal jurisdiction over a defendant may be established through either general or specific jurisdiction. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).

To establish specific jurisdiction, three factors must be present: "[f]irst the defendant must have 'purposefully directed [its] activities' at the forum.  Second, the litigation must 'arise out of or relate to' at least one of those activities. And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with 'fair play and substantial justice.'" *D'Jamoos*, 566 F.3d at 102 (internal citations omitted). Here, personal jurisdiction may be firmly established by a specific jurisdiction analysis.

### B.  Harvard Is Vicariously Liable for the Actions of Its Employee, Joshua Benton

All of Viola's claims in both tort and contract arise from Benton's unauthorized access of her email address and subsequent doxxing of Viola.  Notably, Harvard does not dispute that Benton's actions deliberately targeted Pennsylvania and are sufficient to establish specific jurisdiction for Viola's tort claims.[2] Rather, Harvard implausibly argues that no jurisdiction exists

---

[2] Harvard does not argue this point in its motion to dismiss. *See generally Vangheluwe v. Got News,* LLC, 365 F. Supp. 3d 850, 858-862 (E.D. Mich. 2019) (finding specific jurisdiction on analogous facts alleging doxxing on Twitter).

on these claims solely because it is not vicariously liable for Benton's actions. It also claims that this Court does not have jurisdiction to adjudicate Viola's contract claims. As detailed below, both arguments must fail based on the facts alleged in the Amended Complaint.

           **1.** ***Harvard is vicariously liable for Viola's tort claims and subject to jurisdiction in Pennsylvania.***

Harvard's vicarious liability argument is founded on the untenable claim that Benton's actions were not undertaken in the course and scope of his employment as a journalist. Unfortunately for Harvard, its own arguments demonstrate the logical fallacy of this position.

The actions of an employee which cause injury to a third party give rise to vicarious liability of his employer if those acts were committed during the "course and scope" of his employment. *Fitzgerald v. McCutcheon*, 270 Pa. Super. Ct. 102, 106, 410 A.2d 1270, 1271 (1979). Pennsylvania has adopted the Restatement (Second) of Agency, which states that conduct is within the course of employment if: " (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; and (c) it is actuated, at least in part, by a purpose to serve the master. *Id.* at 1272 (citing Restatement (Second) of Agency, §228). This liability may extend to intentional acts. *Id.* An employer may be liable if their employee speaks or acts, purporting to do so on behalf of his principal, and there is reliance upon his apparent authority or he is aided in accomplishing the tort by the existence of an agency relation.  *Id.* at cmt. A.

Here, there is no dispute that Benton was employed by Harvard as a journalist and acting as one when he committed the underlying offenses alleged in Plaintiff's Amended Complaint. Harvard argues that Benton used his administrative access, as a "reliable investigative method", to identify Viola and "accurately reported" Viola's allegedly newsworthy statements to the public when he doxed her. Def. Harvard's Mot. to Dismiss Pl. Am. Compl. 35, 38, ECF No. 12-1.

Harvard also fully ratified Benton's conduct as being journalistic. Benton's apology, published after doxxing Viola, was written and published at his employer's direction.[3] It acknowledged that he did not "adhere to rigorous reporting methods" and his tweets "did not meet Nieman's journalistic standards." Pl. Am. Compl. ¶¶ 58, 60, Ex. L. Notably, Benton's apology never stated that he did not speak for his employer. It also did not in any way attempt to publicly distance Nieman or Harvard from responsibility for his actions which were all within the nature of his employment. Benton's Twitter profile stated, "I run @niemanlab at Harvard" as part of his account description without any disclaimer concerning his employer. *Id.* at ¶ 15.

As the director and founder of Nieman Lab, a platform with a self-proclaimed focus on journalism in the "Internet Age," Benton admittedly fulfilled his role "by day, and often by night." Pl. Am. Compl. ¶¶ 12, 16. This included using his Twitter account "to interact with other journalists and readers on behalf of his employer." *Id.* Thus, his actions were taken during the time and space limits of his employment and were also motivated in part to serve the purposes of Harvard in promoting the Nieman Lab Brand and its articles. *Id.* at ¶ 51, Ex. K.

Viola's assertions that Benton was acting during the course and scope of his employment are not simply "conclusory allegations" or "legal conclusions" as Harvard claims. Pl. Am. Compl. ¶¶ 39-41. Nor is the fact that Benton acted improperly a bar to finding Harvard vicariously liable for his actions.

---

[3] Viola's assertion that Harvard met with Benton, directed him to draft an apology and ratified his conduct by taking no disciplinary action is based on email correspondence received from Harvard's counsel to Plaintiff's counsel on February 4, 2020, stating that "senior Nieman leadership, including Ms. Lipski drafted [the] statement of apology. Mr. Benton participated in the discussion." Harvard's sudden amnesia as to how "such views were supposedly divined" by Viola is perhaps more reflective of its own internal miscommunication than any questionable factual basis asserted by Viola.

For example, the facts in this case are analogous to *Butler v. Flo-Run Vending Co.*, 557 A.2d 730, 737 (Pa. Super. Ct. 1989).[4] In *Butler,* the court found an employer liable for its supervisors planting a stolen ring in the truck of the plaintiff and falsely reporting to the police that the plaintiff was responsible for the robbery. *Id.* The court held that the supervisors were acting within the scope of employment because cooperating with authorities to solve the burglary of the company, among other things, was within the nature of their employment, occurred substantially during the time and space limits of their employment and were for the benefit of the employer in its efforts to solve the crime. *Id.* Thus, while their actions were improper, the court found evidence from which a jury could conclude that it was within the scope of their employment. *Id.*

Other courts have also found vicarious liability even when employees took actions deemed improper: *Aliota v. Graham,* 984 F.2d 1350, 1359 (3d Cir. 1993) (employer held vicariously liable for defamatory statements made by hospital employees even though they acted contrary to employer's direction) (citing Restatement (Second) of Agency § 230, "An act, although forbidden, or done in a forbidden manner, may be within the scope of employment"); *Brumfield v. Sanders,* 232 F.3d 376, 380-381 (3d Cir. 2000) (applying Pennsylvania law) (employer held vicariously liable for false statements made by employees even if partially motivated by personal animus).

Accordingly, Viola has established that Harvard is vicariously liable for Benton's tortious conduct and subject to specific jurisdiction in Pennsylvania.

---

[4] The Pennsylvania Superior Court adopted the standard set forth in Restatement (Second) of Agency, § 228.

### 2.   *This Court has jurisdiction to adjudicate Viola's contract claims*

a.   *The Interactive Nature of the Nieman Lab Website Subjects Harvard to Jurisdiction in Pennsylvania*

In Pennsylvania, personal jurisdiction may be established based on a defendant's internet presence and courts use the sliding scale test articulated in *Zippo Mfg. Co. v. Zippo Dot Com* to determine personal jurisdiction based on a website. 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). The *Zippo* scale ranges from completely passive websites that merely make information available to users in the forum (no personal jurisdiction) to websites that actively transact business with residents of the forum (personal jurisdiction exists). *Id.* It requires courts to look to "the level of interactivity and commercial nature of the exchange of information on the Internet." *Id*. Even a single contact can be sufficient based on the nature and quality of the contact with the forum. *Id.*

In *Zippo*, specific jurisdiction was established over the owner of a website that, like the Nieman Lab website, occupied the "the middle ground" of the *Zippo* scale — the part of the spectrum comprised of interactive websites where a user can exchange information with the host computer." *Id.*

In *Zippo*, the defendant operated an internet news service and offered users paid subscriptions which allowed them to be assigned a password permitting access to Internet newsgroup messages stored on their servers. *Id.* at 1121. The court was unpersuaded by the defendant's argument that its contacts with Pennsylvania were fortuitous because it did not actively solicit business within the forum and its business contacts with forum residents were initiated by the residents. *Id.* at 1126.

The court reasoned that the defendant knew that the result of these contracts would be the transmission of electronic messages into Pennsylvania and the transmission of these files was

entirely within its control. *Id.* at 1127. The court also held that the interests of the plaintiff in seeking relief in Pennsylvania outweighed the burden created on the defendant. *Id.*

Likewise, the Nieman Lab website allows users to subscribe to its monthly newsletter and to purchase subscriptions to its print content using the website or a printable form available on the website. https://niemanreports.org/about-nieman-reports/subscribe-to-nieman-reports/. *See* attached Exhibit A to Pl. Br. in Opp'n. Additionally, Nieman Lab permits users to leave comments on its articles which allow them to directly interact with its host computer. Under the *Zippo* scale, and construing all disputed facts in favor of Viola, Harvard's Nieman Lab website subjects it to this Court's jurisdiction in Pennsylvania.

   b.  *All of Viola's Claims Arise from the Same Nucleus of Operative Facts*

Even if the Court finds that it does not have personal jurisdiction over Viola's contract claims, it can still exercise pendent personal jurisdiction over these claims because they arise from the same nucleus of material facts as her tort claims. *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D.N.J. 2016).

The Third Circuit takes a "liberal interpretation" in determining the scope of what constitutes a common nucleus of operative facts and has observed that mere tangential overlap of facts is insufficient, but total congruity between the operative facts of the two cases is unnecessary." *Id.* (citing *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 105 (3d Cir. 1988)). Thus, if the court determines that the "critical background facts" are the same, then they emerge from the same common nucleus. *MaxLite Inc.,* 193 F. Supp. 3d at 390. When exercising pendent personal jurisdiction, the court should take a "discretionary approach" including "considerations of judicial economy, convenience and fairness to litigants." *Robinson v. Penn Cent. Co.*, 484 F.2d 553, 556 (3d Cir. 1973) (internal citations omitted).

Here, all of Viola's claims arise from the same "critical background facts" involving Benton's unauthorized access of her email address and subsequent doxxing of Viola which destroyed her anonymity. Viola will rely on the same facts to prove her tort claims as her contract claims and they constitute more than mere "tangential overlap." Further, Harvard has presented no argument that litigating these claims in Pennsylvania will present additional burden or hardship beyond litigating the tort claims before this Court. Thus, the Court should exercise pendent jurisdiction if it finds it lacks personal jurisdiction over Viola's contract claims.

Even if Harvard establishes that there is no specific jurisdiction, which it has not, the proper remedy would be to transfer this matter to a Court where the action could have been brought, not dismissal. Pursuant to 28 U.S.C. §1631, if a court determines that it lacks jurisdiction over a matter the court shall, if it is in the interest of justice, transfer said case to any other such court in which the action could have been brought. "Once a district court determines that it lacks personal jurisdiction over the defendant, it has the option of dismissing the action or transferring it to any district in which it could have been brought." *Campbell v. Mars, Inc.*, 2016 U.S. Dist. LEXIS 161996 at *8 (E.D. Pa. Nov. 22, 2016) (internal citations omitted). Accordingly, if the Court rules that jurisdiction does not exist here over plaintiff's contract claims, Viola requests a transfer rather than dismissal.

## II.   VIOLA HAS ALLEGED SUFFICIENT FACTS TO SUSTAIN ALL OF HER CLAIMS

### A.  Fed. R. Civ. P. 12 (b)(6) Standard of Review

Harvard argues that all of Viola's claims fail as a matter of law under Fed. R. Civ. P. Rule 12(b)(6). A motion to dismiss under this rule may only succeed where a plaintiff has not pled sufficient facts to state a claim for relief that is "plausible" on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion. First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted therein. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Importantly, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* at 210. Any facts pled must be taken as true, and any legal conclusions asserted may be disregarded. *Id*. at 210-211. Second, the court must determine whether those factual matters averred are sufficient to show that the plaintiffs have a "plausible claim for relief." *Atiyeh v. Nat'l Fire Ins. Co*., 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010) (citing *Fowler*, 578 F.3d at 210-211).

### B. Viola's Allegations Have Remained Consistent and Consideration of Harvard's Extraneous Exhibits is Improper

Harvard's Motion to Dismiss impermissibly asks the Court to ignore the allegations contained in Viola's Amended Complaint and adopt their own alternative version of the facts in its analysis.

Harvard attempts to introduce evidence concerning an alleged conflict between the facts pled in Viola's Complaint and her Amended Complaint concerning her defamation claim. Harvard's vigorous protest of Viola's denial of the Muslim Comment (discussed below) in its Motion to Dismiss is misplaced and misstates Viola's position. Viola has never acknowledged publication of this comment or expressed that it is consistent with her public or private view of Muslims.  Harvard's effort to discredit Viola based on a fabricated factual conflict presented by the Amended Complaint are baseless and should be disregarded. The Third Circuit has made clear that an "amended complaint supersedes the original and renders it of no legal effect, unless the

amended complaint specifically refers to or adopts the earlier pleading." *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013).

Harvard also attached four extraneous exhibits that have no bearing on the issues before this Court, including a July 18, 2018 demand letter from Viola's counsel to Joshua Benton; a copy of the Temple University Mission Statement; copies of what purports to be a privacy policies from Breitbart; and copies of policies that purport to be from the Philadelphia Inquirer. Def. Harvard's Mot. to Dismiss Ex. B-E. None of these exhibits can be considered by the Court for purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

It is well settled that a court ruling on a motion to dismiss is limited to considering "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Berkery v. Equifax Info. Servs.*, 429 F. Supp. 3d 24, 30 (E.D. Pa. 2019). *See also Mele v. Federal Reserve Bank of N.Y.*, 359 F.3d 251, 255 n. 5 (3d Cir. 2004) (holding even if extraneous exhibits attached to a motion to dismiss are undisputedly authentic, it cannot be considered if the plaintiff's claims are not based on it).

These extraneous exhibits were not attached to the Amended Complaint, are not matters of public record and do not form the basis of any of Viola's claims. Further, whether or not these exhibits exist is irrelevant to the claims asserted by Viola. They serve no other purpose than to clutter the Court's analysis and should therefore be disregarded by this Court.

### C.  Viola Has Sufficiently Stated a Claim for Intrusion Upon Seclusion

Pennsylvania has adopted the Restatement (Second) of Torts which defines intrusion upon seclusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or
> seclusion of another or his private affairs or concerns, is subject to liability to the

other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Wolfson v. Lewis*, 924 F. Supp. 1413, 1419 (E.D. Pa. 1996) (citing Restatement (Second) of Torts § 652B (1977)). Thus, Viola met her burden of stating a claim for this tort by asserting facts to allege that Defendant Benton's actions were "an intentional intrusion on the seclusion of [her] private concerns which was substantial and highly offensive to a reasonable person" and "which could establish that the information disclosed would have caused mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McGuire v. Shubert,* 722 A. 2d 1087, 1092 (Pa. Super. Ct. 1998).

Specifically, Viola asserts that Defendant Benton abused his administrative access to her email address to discover other identifying information about her, her employer and her colleagues and to harass her repeatedly through a series of Tweets doxxing her on Twitter.  Pl. Am. Compl. ¶¶ 47, 77. This intrusion violated Viola's right to keep her name and employer separate from the anonymous Truthseeker Account and also caused her to be bombarded by dozens of harassing and disturbing emails, phone calls and messages which were highly offensive and caused her great distress. *Id*. at ¶¶ 42, 63, 64. In fact, the intrusive effects on her personal life and day to day activities were so severe and overwhelming that she received calls from the Temple University Campus Police, her Dean, and employer, to inquire about her safety and well-being. *Id.* at ¶ 64.

Harvard conveniently attempts to sidestep the factual allegations of Viola's Amended Complaint to substitute its own narrative that Viola's claims are barred because Defendant Benton "had a right to view the information at issue." Def. Harvard's Mot. to Dismiss 22.  In support of this argument, Harvard relies on the easily distinguishable case, *Burger v. Blair Medical Assoc.* in which the Supreme Court of Pennsylvania found no intrusion claim where a health care provider disclosed a patient's medical records. 964 A.2d 374 (Pa. 2009).

In *Burger*, the court declined to analyze the patient's potential invasion of privacy claim under an intrusion framework because the health care provider "legitimately obtained" the information as part of the plaintiff's treatment stating that intrusion upon seclusion "requires an intentional and unwarranted acquisition by the defendant." *Id.* at 379. However, contrary to Harvard's claim, Defendant Benton's discovery of Viola's identifying information was not legitimately obtained. Viola's consent to Benton's access of her email address was limited solely "for the purpose of moderation only, not for any journalistic purpose or reason." Pl. Am. Compl. ¶ 38.  Viola never consented to Defendant Benton accessing her email account to maliciously investigate other identifying information about her, her employer, or colleagues.  Pl. Am. Compl. ¶¶ 77, 78.

This case is more analogous to the facts in *McGuire v. Shubert*. In *McGuire*, an employee of a bank was accused of accessing the bank records of her adversary in an equity case to disclose the adversary's banking information to her attorney for use in the pending litigation between the parties. *McGuire*, 722 A.2d. at 1089.  The bank employee's access to information concerning the customer's accounts through her position, was undisputed. Although the bank had initially obtained the customer's financial information legitimately, that did not bar her claim for intrusion upon seclusion when it was accessed by their employee and used improperly. The court held that the plaintiff bank customer pled a claim for intrusion upon seclusion by averring facts that could establish that acquiring knowledge about the customer's financial holdings was substantial, could be highly offensive to a reasonable person, and would cause mental suffering to a person of ordinary sensibilities.   *Id.* at 1092.   Likewise, in this case, Viola never consented to Benton accessing her email account for any purpose other than moderation, and he had a contractual duty not to disclose her private information.

Harvard also attempts to minimize the injury caused by Defendant's Benton's unauthorized access of Viola's email address by patronizingly stating that it "caused her no conceivable harm." Def. Harvard's Mot. to Dismiss 23. However, the violation of Viola's privacy did cause her great mental and emotional distress and the unauthorized intrusion itself imposes liability for damages. Pl. Am. Compl. ¶¶ 41-42; *Kedra v. Philadelphia*, 454 F. Supp. 652, 667 (E.D. Pa. 1978).

As the Restatement (Second) of Torts § 652B cmt. a. (emphasis added) makes clear, the tort is committed when the intrusive act is committed, whether or not the tortfeasor discloses the invasion or any information about the plaintiff to third parties:

> The form of invasion of privacy covered by this Section ***does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion***, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.

Thus, the information obtained through the intrusion need not be used or disclosed to third parties to establish a viable claim for invasion of privacy under this Section which is well established in courts applying Pennsylvania law. *See Vernars v. Young,* 539 F.2d 966, 969 (3d Cir. 1976) (holding plaintiff stated a claim for intrusion upon seclusion where defendant was accused of opening and reading her personal mail without her consent with no additional publication alleged); *Doe v. Kohn Nast & Graf, P.C.*, CIVIL ACTION NO: 93-4510, 1994 U.S. Dist. LEXIS 13476, at *5-6 (E.D. Pa. Sep. 20, 1994) (holding allegations of opening mail addressed to plaintiff sufficient to state claim for intrusion); and *Abady v. Macaluso*, 90 F.R.D. 690, 694 (E.D. Pa. 1981) (holding allegation of entry into apartment without permission and reading personal correspondence sufficient to state claim for intrusion).

Harvard's attempt to convert Viola's intrusion claim into a publication of private facts claim ignores the facts actually pled in the Amended Complaint and the fact that Benton's malicious harassment of Viola is also an unlawful intrusion on her privacy.

Furthermore, this Court has repeatedly recognized that harassment can form the basis for an intrusion upon seclusion claim. In *Diaz v. D.L. Recovery Corp.*, the court held that one telephone call could be sufficient to state a claim for intrusion upon seclusion. 486 F. Supp. 2d 474, 479-80 (E.D. Pa. 2007) (internal quotation marks omitted). The court reasoned that "it is clear that the important point is not that the intrusions be persistent but that the intrusions should by one means or another---whether by persistent repetition or by some other aspect of the intrusion, rise to the level of what a reasonable person would find highly offensive." *Id.* at 480.

Likewise, in *Wolfson v. Lewis*, this Court held "conduct that amounts to a persistent course of hounding, harassment and unreasonable surveillance" may be actionable as intrusion upon seclusion. *Wolfson*, 924 F. Supp. at 1420; *See also Speight v. Pers. Pool of Am., Inc.*, CIVIL ACTION NO. 93-2055, 1993 U.S. Dist. LEXIS 9974, at *20 (E.D. Pa. July 20, 1993) (holding allegations of repeated sexual harassment in workplace sufficient to state claim for intrusion); and *Schlichter v. Limerick Twp.*, No. 04-CV-4229, 2005 U.S. Dist. LEXIS 7287, at *39 (E.D. Pa. Apr. 26, 2005) (holding allegations of publication of false statements regarding extramarital affair in local newspaper sufficient to state claims for false light invasion of privacy and intrusion).

Here, Benton repeatedly targeted and harassed Viola in a string of tweets published to thousands of Twitter followers which completely disrupted her personal and professional life and caused her great distress. Pl. Am. Compl. ¶¶ 42, 63, 64. Viola has sufficiently stated a claim for intrusion upon seclusion and Harvard's motion to dismiss this claim should be denied.

15

**D.  Viola Has Sufficiently Stated a Claim For Publication Of Private Facts**

In Pennsylvania, a defendant is subject to liability for publication of private facts "if it gives publicity to a matter concerning the private life of another and if the matter publicized is of a kind that would be highly offensive to a reasonable person and is not of legitimate concern to the public." *McCabe v. Vill. Voice, Inc.*, 550 F. Supp. 525, 529 (E.D. Pa. 1982) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 652D). In *McCabe*, this court held that publication of a photograph of a woman in a bathtub was not newsworthy because it serves "no legitimate purpose of disseminating news" and "needlessly exposes aspects of the plaintiff's private life to the public." *Id.* at 530. Likewise, Benton's publication of Viola's name and identifying information in association with the Truthseeker Account also served no legitimate newsworthy purpose.

Harvard bases its argument to dismiss this claim on the false notion that personal political beliefs and opinions of a college professor are of legitimate public concern. Harvard's Motion to Dismiss waxes loquacious on the "important function" of education and the role of "public school teachers," Def. Harvard's Mot. to Dismiss 27-28. However, it is noticeably deficient in citing any case law to support its central argument that any of these observations translate into the public's legitimate interest in the privately held beliefs of Viola concerning any of the matters disclosed by Benton.

Despite Harvard's improper attempt to cite Temple's Mission Statement[5] to critique comments attributed to Viola, these comparisons are irrelevant to her duties as a professor. As stated in the Amended Complaint, "[t]he criteria Temple used to evaluate Viola's job performance

---

[5] As discussed above, Harvard's Motion to Dismiss inappropriately cites the Temple University Mission Statement (Def. Harvard's Mot. to Dismiss Ex. C) which should not be considered in the Court's review.

as a professor did not include her personal political opinions or beliefs. As an employee of a public university, Viola was not subject to any restrictions concerning her use of online platforms outside of the workplace to comment on political matters or to express her opinions under her own name or through a pseudonym." Pl. Am. Compl. ¶ 10.

Harvard cites the U.S. Supreme Court case, *Snyder v. Phelps*, to define the type of speech that deals with matters of public concern. Def. Harvard's Mot. to Dismiss 24-25 (citing *Snyder v. Phelps,* 562 U.S. 443 (2011)). However, the *Snyder* case was a narrow holding that specifically dealt with the speech rights of a religious group to picket outside funerals and involved speech at a public place on a matter of public concern. *Snyder,* 562 U.S. at 458-59. This is a far cry from anonymous online speech concerning personally held political beliefs, which is the case here. Fundamentally, *Snyder* was about the right of individuals to publicly declare their controversial political beliefs on matters of public concern, not the right of a reporter to step into the role of the thought police to unlawfully disclose privately held political beliefs that were intended to be kept confidential. Justice Breyer picked up on this conflict in his concurrence by posing the following hypothetical "suppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means." *Id.* at 461. Plaintiff has sufficiently stated a claim for publication of private facts and Harvard's motion to dismiss this claim should be denied.

### E. Viola Has Sufficiently Stated Claims for Defamation and Defamation by Implication

#### 1. *Benton's publication of the Gateway Pundit comment about muslims is defamation per se*

Five long days after unleashing his unprovoked doxxing attack against Viola, (after drawing much deserved criticism from other journalists and his employer) Benton and Harvard jointly issued an apology on Twitter acknowledging that he failed to meet Nieman's journalistic standards by not bothering to "mak[e] an effort to contact her and seek confirmation and explanation" of the statements he published. Pl. Am. Compl. ¶ 60, Ex. L. Unfortunately for Viola, the damage had already been done.  One of the comments Benton attributed to Viola in his Twitter Statements was purportedly published under the Truthseeker pseudonym to the Gateway Pundit article titled, "Muslims Take Over Street- Start Praying in Front of Trump Tower New York for Ramada…" (the "Muslim Comment"). The Muslim Comment stated, "Scum. Deport them. They hate us. Get rid of them." Pl. Am. Compl. ¶ 52, Ex. K.  As stated above, Viola specifically denies that she authored or published this comment and that it is not consistent with her public or private views of Muslims. Benton attributed the Muslim Comment to Viola along with the commentary, "She's also not a particular fan of Muslims it seems."

In Pennsylvania, "[w]ords that on their face and without the aid of extrinsic evidence are recognized as injurious are actionable [as defamation] per se." *Joseph v. Scranton Times L.P.*, 2008 PA Super 217, ¶ 64 n.23, 959 A.2d 322, 344 (2008).  The U.S. Supreme Court has recognized that falsely attributing words to another may give rise to a claim for defamation in at least two ways.  "A fabricated quotation may injure reputation because it attributes an untrue factual assertion to the speaker", or "because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold." *Masson v. New Yorker Magazine*, 501 U.S. 496, 511, 111 S. Ct. 2419, 2430, 115 L.Ed.2d 447, 469 (1991).

Here, falsely attributing a statement to Viola calling Muslims "scum" and advocating for deporting them is defamation per se.  Harvard claims that the "gist" or "sting" of the Muslim

Comment is similar to another comment published by the Truthseeker Account to the Philadelphia Inquirer. Def. Harvard's Mot. to Dismiss 36; Pl. Am. Compl. Ex. K.   However, it is not. The Philadelphia Inquirer comment at issue reads as follows:

> I am a journalism professor and I'll tell you why I won't subscribe.  Your coverage is virulently pro-leftist, and you try to control speech, which is antithetical to the First Amendment you claim to respect. How? I've been tracking your pattern of not allowing comments on any stories that involve race, crimes that involve African Americans, or any article that would give readers a chance to express any anti-Muslim or anti-immigrant sentiments. Although you and your editorial team may find these opinions uncomfortable and even repulsive, the First Amendment protects those opinions, and you as the standard bearers for the fourth estate have an obligation to let folks express themselves. You are failing members of the public whom you don't agree with, and that is why you will never expand your readership.

Unlike the Muslim Comment, this comment does not convey any personal animus toward Muslims. Conversely, like the Truthseeker Account comment posted to the Nieman Lab article, its critique focuses on the reporting methods of the publication, thus the "gist" of this comment is not the same as the "Muslim Comment" and should not be included in the Court's analysis of whether it was defamatory.

### 2. *Benton's selective publication of the Twitter statements constitutes defamation by implication*

When the Twitter Statements are read collectively, they create the false impression that Viola is a racist, Islamophobic and undeserving of her job as professor of journalism.  Harvard's reliance on *McCafferty v. Newsweek Media Group, Ltd* for the proposition that Benton's Tweets are not defamatory is without merit. 955 F.3d 352 (3d Cir. 2020). Harvard attempts to recast Benton's actions to doxx Viola and publish the Twitter Statements in the innocuous light of "a simple accusation of racism" which *McCafferty* held was insufficient to sustain a defamation claim in Pennsylvania. *Id.* at 358.  However, Benton's accusations against Viola implied much more about her character and conduct which *McCafferty* acknowledged can be actionable. *Id.*

In its analysis, *McCafferty* discussed the Pennsylvania Supreme Court defamation case *MacElree v. Phila. Newspapers*, which had facts more analogous to this one.  544 Pa. 117, 674 A.2d 1050 (1996).  In *MacElree*, the plaintiff, a judge and former district attorney, sued a newspaper that published an article which included a disputed accusation referring to him as "the David Duke of Chester County." *Id.*  The court held that a reasonable person could conclude that the plaintiff had been accused of abusing his power as an elected official "to further racism and his own political aspirations," and could be construed to mean that he "was acting in a racist manner in his official capacity as district attorney." *Id.* at 125. Likewise, a reasonable person reading Benton's Twitter Statements and their reference to Viola's profession and colleagues at Temple University,  could conclude that Viola acted in a racist and Islamophobic manner in her capacity as a journalism professor and was unfit for continued employment.   Pl. Am. Compl. ¶¶ 49-51, 97-98, Ex. K.

While Harvard claims that Benton's doxxing attack on Viola included statements that are substantially true, even where a publication includes true statements, the falsity required to sustain claims for both implied defamation and false light invasion of privacy may be derived from the inference they create. *Dunlap v. Phila. Newspapers, Inc.*, 301 Pa. Super. 475, 482, 448 A.2d 6, 10 (1982) (defamation); *Larsen v. Phila. Newspapers, Inc.*, 375 Pa. Super. 66, 81, 543 A.2d 1181, 1188 (1988) (false light).  In *Dunlap*, the court held that "literal accuracy of separate statements will not render a communication 'true' where, as here, the implication of the communication as a whole was false." *Dunlap*, 301 Pa. Super. at 493.

The *Larsen* court agreed. "Despite the accuracy of the facts disseminated, discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed." *Larsen,*

375 Pa. Super. at 1189. In *Larsen,* the court held that the plaintiff subject of a news article stated a claim for false light invasion of privacy by alleging that the defendant newspaper "knowingly or recklessly selectively printed or broadcast statements or pictures in a manner which created a false impression." *Id.* The court explained that "to permit an editor to publish misleading portions of the truth is the equivalent of sanctioning the promulgation of falsehoods under the guise of the First Amendment." *Id; See also Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (citing *Larsen* in finding that plaintiff stated a false light claim where defendants published an article which selectively published facts which portrayed him in a false light).

Here, Benton selectively published comments attributed to the Truthseeker Account in a manner designed to create the impression that Viola is racist, Islamophobic and not competent to do her job as a journalism professor. Pl. Am. Compl. ¶ 54. Benton's desired end was to harass Viola, and to harm her both professionally and personally. *Id.* at ¶¶ 44-47, 49-50. Instead of contacting Viola to confirm her authorship of the Truthseeker Account comments, to ask if the comments reflected her actual beliefs about the subject matters referenced or to provide her with an opportunity to respond, Benton maliciously published the Twitter Statements to create his own narrative and attack her livelihood. *Id.* at ¶¶ 43, 47, 50.

### F.  Viola Has Sufficiently Stated a Claim for False Light Invasion of Privacy and Has Sufficiently Alleged Actual Malice

In addition to the newsworthiness and falsity elements addressed above, Harvard attacks Viola's False light claim on the basis that she has not pled facts supporting her assertion that Benton published the Twitter Statements with actual malice.[6] Harvard's analysis erroneously

---

[6] While Viola has sufficiently alleged that Benton acted with actual malice, she does not concede to Harvard's characterization of her as a public figure because she is a college professor. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S. Ct. 2675, 2688, 61 L.Ed.2d 411, 431 (1979) (finding college professor plaintiff was not a public figure and observing "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure").

focuses on whether Benton had any doubts as to the identity of Viola as the owner of the "Truthseeker Account." But the actual malice inquiry should focus on whether he acted with knowledge or reckless disregard as to whether Viola had in fact published the comments he attributed to her in the Twitter Statements and her views on the subject matter referenced. By his own admission, he made absolutely no effort "to contact her to seek confirmation and explanation and otherwise adhere to rigorous reporting methods" to determine the truth of his Twitter Statements that Viola herself had published the comments or held racist or Islamophobic views. Pl. Am. Compl. ¶ 60, Ex. L.

The actual malice requirement that the statements be publicized with "knowledge or in reckless disregard" of their falsity can be shown in many ways including but not limited to "subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration." *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 471, 926 A.2d 899, 906 (2007) (citing *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643, 60 L.Ed.2d 115, 126 (1979)).

The custom and usage factor is particularly relevant in this instance because Benton's actions to investigate and report Viola's identity in connection with the Truthseeker Account did not fall into the category of "hot news" which  has been defined as  "information that must be printed immediately or it will lose its newsworthy value." *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983). When a publication does not fall into this category of news, "actual malice may be inferred when the investigation for a story…was grossly inadequate in the circumstances." *See also Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 507 (E.D. Pa. 2010) (internal citation omitted)

("When there is no pressing need for immediate publication of a defamatory allegation, actual malice may be inferred if the investigation given to the allegation is grossly inadequate under the circumstances").

In this instance, Benton, completely disregarded his ethical duties as a journalist and contractual obligations as the administrator of the Nieman Lab website to maliciously publish select comments from the Truthseeker Account (the "Twitter Statements") to his thousands of Twitter followers and her professional colleagues.  Pl. Am. Compl. ¶¶ 39, 43, 48, 49.  His actions to publicize the Twitter Statements were more than mere negligence. They were a combination of ill will toward the "right leaning political views" expressed by the Truthseeker Account, and a malicious and reckless desire to disregard plaintiff's right to privacy in order "to see her, harassed publicly by hundreds of people, fired from her job and have her censured." *Id.* at ¶ 45.  As an award winning investigative journalist and frequent Twitter user whose livelihood depends on "help[ing] journalism adapt to the Internet Age," Benton was well aware that he was blatantly violating acceptable journalistic standards by targeting and harassing Viola in this manner. *Id.* at ¶¶ 12-13.  As Benton later acknowledged in the apology drafted with Harvard, his actions did not stand up to the scrutiny of *Weaver*'s "custom and usage" criteria. *Id.* at ¶ 60, Ex L.  Nor was he reporting "hot news" that could not withstand the time it would have taken to contact Viola to conduct a proper investigation. When considered together, and in the light most favorable to Viola, Benton did act with actual malice and this claim must be sustained.

### G.  Viola Has Sufficiently Stated a Claim for Breach of Contract

Viola has alleged facts to assert a breach of contract action in Pennsylvania, namely: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *Alpart v. Gen. Land Ptnrs, Inc.*, 574 F. Supp. 2d 491, 502

(E.D. Pa. 2008) (internal citation omitted).   As discussed below, Viola has alleged that Harvard was bound by the terms of both their own privacy policy, (the "Harvard Privacy Statement") and the terms of the comment platform, Disqus.  Benton violated the terms of both policies which resulted in damages to Viola in the form of loss of income, lost productivity, expenses incurred and the loss of intangible assets.

### 1. *Benton violated the terms of the Harvard Privacy Statement Browsewrap Agreement*

Harvard tries to disclaim its obligations under the Harvard Privacy Statement by making the nonsensical argument that it does not apply to the Nieman Lab website. Harvard's claims that its Privacy Statement only applies to "the main Harvard University website," that the "Harvard website 'may contain links to other websites'" and that it "was not responsible for the privacy practices or the content of such websites" all lack credibility in light of the fact that this policy is linked to directly on every page of the Nieman Lab website from a link labeled "Privacy" and is the only "privacy policy" linked. Def. Harvard's Mot. to Dismiss 41-42; Pl. Am. Compl. ¶ 28, Ex. G.  Further, while Harvard claims that the plain terms of its Privacy Statement only govern "commercial use" by Harvard of users' information, it ignores the unequivocal promise, that while user data may be collected, users of the website will "remain anonymous."  Pl. Am. Compl. ¶ 30, Ex. G.

The Harvard Privacy Statement is a browsewrap agreement which instructs website visitors that "[b]y using this website you are consenting to our collection and use of information in accordance with this privacy policy." *Id.* at Ex. G. This aligns with definition of a browsewrap agreement set forth by the Western District of Pennsylvania which says "the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website —the user is agreeing to and is bound by the site's terms of choice."

*HealthPlanCRM, LLC v. AvMed, Inc.*, No. 2:19-cv-1357-NR, 2020 U.S. Dist. LEXIS 74187, at

*45 (W.D. Pa. Apr. 28, 2020) (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y.

2012)).   Courts have addressed the enforceability of browsewrap agreements by both websites

and users. *See HealthPlanCRM, LLC,* 2020 U.S. Dist. LEXIS at *45-51 (holding website

browsewrap agreement enforceable and binding on both user and their employer); *In re Am.*

*Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 567 (N.D. Tex. 2005) (suggesting breach of

contract can be asserted by user  for website's violation of privacy policy where damages are

alleged). Benton's disclosure of Viola's identity is a violation of the Harvard Privacy Policy

Statement browsewrap agreement and Viola has clearly alleged a valid claim for breach of

contract.

### 2.   *Benton violated the Terms of the Disqus Policies*

Harvard's Nieman Lab website utilizes the comment platform, Disqus to allow readers to

post comments to articles on the website. Pl. Am. Compl. ¶ 22. As a website that utilized the

Disqus platform, Nieman Lab was subject to the Basic Rules for Disqus-Powered Sites (the

"BRDPS") and the Basic Rules for Disqus (the "BRD"). *Id.* at ¶ 22, 24, Ex. D, F. The BRDPS

state that "user information is for moderation purposes only" and "distribution of personally

identifiable information is prohibited" as is the "intimidation" of Disqus users. *Id.* at ¶ 22, Ex. D.

As a Disqus user, Viola was required to agree to the terms of the BRD prior to posting any

comments and she relied upon them when publishing comments through the platform.  *Id.* at ¶ 25.

Harvard conveniently ignores the BRDPS requirement that "user information is for

moderation purposes only" and downplays the fact that Disqus has itself affirmed Viola's

understanding that as a site moderator, Benton "cannot use [her email address] for any purpose

other than moderation."  *Id.* at ¶ 23, Ex. F; Def. Harvard's Mot. to Dismiss n.19.  Instead, Harvard

claims that Benton's actions did not violate its agreement with Disqus because the language in the BRD which prohibits users from "posting personally identifiable information" does not include "real name" under this provision. Pl. Am. Compl. Ex. F.

Even if Viola's real name isn't currently covered by the BRD as an example of personally identifying information, Benton far exceeded that threshold by explicitly naming her employer, colleagues and supervisors which is tantamount to posting her work address, phone number and email address which are all cited as examples of personally identifiable information in a list that doesn't expressly state that it is exhaustive. Further, Harvard notably does not deny Viola's allegations that Benton violated other aspects of the BRDPS and BRD that prohibit "intimidation" of Disqus users and the "targeted and systematic harassment of people." Pl. Am. Compl. ¶¶ 22, 24, 56, Ex. D, Ex. F.

Viola has properly pled the necessary elements to allege a cause of action for breach of contract and this claim should not be dismissed.

### H.  Viola Has Sufficiently Stated a Claim for Promissory Estoppel

Viola alleged the required elements to sustain a claim for promissory estoppel in Pennsylvania. Namely, that Harvard 1) made a promise that it should have reasonably expected to induce action or forbearance on the part of the Viola; 2) Viola actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. *Crouse v. Cyclops Indus.*, 560 Pa. 394, 403, 745 A.2d 606, 610 (2000).

Harvard's attempts to discredit Viola's reliance on its Privacy Statement and to distract the Court with the addition of extraneous exhibits to their Motion to Dismiss which purport to be policies from other websites are neither relevant nor proper. *See* Def. Harvard's Mot. to Dismiss Ex. D, Ex. E.

As discussed above, Viola justifiably relied on the promise of Harvard's Privacy Statement that she would "remain anonymous." Pl. Am. Compl. ¶¶ 32, Ex. G. In reliance on this promise, Viola accessed the Nieman Lab website and comments section using the Truthseeker pseudonym and left a comment. Pl. Am. Compl. ¶¶ 122-23. Based on the language of the Harvard Privacy Statement, the BRD and BRDPS, Viola's reliance on Harvard's promise to maintain her anonymity was reasonable and foreseeable. *Id.* at ¶ 22.

Benton intentionally breached this promise by posting Viola's personal information in the form of her name, her employer and her colleagues in the Twitter Statements. As a result of this broken promise, Viola suffered great personal and professional harm, including the loss of her professional reputation and her job at Temple University, and injustice can only be avoided through the equitable remedy of promissory estoppel.

## I.   Viola Has Sufficiently Stated a Claim for Intentional Infliction of Emotional Distress

Viola has sufficiently pled facts to sustain her claim for intentional infliction of emotional distress by alleging Benton's conduct: (1) was extreme and outrageous; (2) was intentional or reckless; (3) caused emotional distress; and (4) the distress was severe. *Hoy v. Angelone,* 456 Pa. Super. 596, 610 (1997); Restatement (Second) of Torts § 46. Viola alleged that Benton's tortious actions to doxx her were so extreme and outrageous that they drew criticism from others who read the Twitter Statements, including journalists, and led to her being bombarded by dozens of harassing and disturbing emails, phone calls and messages that caused her extreme humiliation, fear for her safety and severe emotional distress for which she sought counseling. Pl. Am. Compl. ¶¶ 47, 57, 63-65. Benton's Twitter Statements were the direct and proximate cause of Viola's distress and it was not only foreseeable that the Twitter Statements would cause such harm, but it was the specific intent behind publishing the Statements. *Id.* at ¶¶ 131-132.

Harvard unconvincingly tries to broaden the narrow, fact specific holding of the U.S. Supreme Court's *Snyder* decision about funeral picketing to argue that the Twitter Statements are protected speech under the First Amendment as statements of public interest which it claims is a bar to intentional infliction of emotional distress claims. Def. Harvard's Mot. to Dismiss 39. However, *Snyder* held that while First Amendment protection can be a valid defense to this state law claim, its application turns on whether the speech is of public or private concern, as determined by all circumstances of the case. *Snyder,* 562 U.S. at 451. Unlike the activism and political speech involved in *Snyder,* which was held to be due "special protection," this case involves matters of private concern regarding Viola's personal political opinions which she intended to express anonymously and Viola has sufficiently stated a claim. *Id.* at 456.

### J. Viola Has Sufficiently Stated a Claim for Tortious Interference with Contractual Relations

To state a prima facie claim of tortious interference with contractual relations in Pennsylvania, Viola must allege: (1) the existence of a contractual, or prospective, relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing contractual relation or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant. *Brokerage Concepts v. United States Healthcare,* 140 F.3d 494, 530 (3d Cir. 1998) (citing *Pelagatti v. Cohen,* 536 A.2d 1337, 1343 (Pa. Super. 1988)).

Here, Viola had an existing contractual relationship with her employer, Temple University, and had a reasonable expectation of ongoing employment based on her successful career and stellar reputation within the Temple community. Pl. Am. Compl. ¶ 8, 9. Once Benton discovered Viola's

existing contractual relationship with Temple University, he intentionally and unlawfully interfered with it by publishing the Twitter Statements for the purpose of destroying her employment with Temple, causing her to lose her job. Pl. Am. Compl. ¶ 50, 65. This is sufficient to state a claim for intentional interference with contractual relations under Pennsylvania law.

## III.    CONCLUSION

Harvard has failed to its burden under either Rule 12(b)(2) or 12(b)(6) in its Motion to Dismiss.  This Court has personal jurisdiction over Harvard and Viola has sufficiently pled facts to sustain each of her claims.

For these reasons, Harvard's Motion to Dismiss should be DENIED.


Respectfully Submitted

MINC LLC
/s/ Aaron M. Minc
Aaron M. Minc (0086718)*
Dorrian H. Horsey (0081881)*
Minc LLC
200 Park Ave., Suite 200
Orange Village, Ohio 44122
Phone: (216) 373-7706
Fax: (440) 792-5327
E-Mail: aminc@minclaw.com
dhorsey@minclaw.com
Attorneys for Plaintiff, Francesca Viola
*Admitted *Pro hac vice*
BOCHETTO & LENTZ
/s/ David P. Heim
DAVID P. HEIM
1524 Locus Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
Facsimile: (215) 735-2455
E-Mail: dheim@bochettoandlentz.com
Attorney for Plaintiff, Francesca Viola

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on July 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to all counsel of record.

<u>/s/ Aaron M. Minc</u>
Aaron M. Minc (OH 0086718)
*Attorney for Plaintiff Francesca Viola*



# NiemanReports

EXHIBIT A

Covering thought leadership in journalism

Home    Articles    Watchdog    Magazine    Archives    About    **Subscribe**

Donate Now

Nieman Foundation at Harvard



## ABOUT NIEMAN REPORTS

About Nieman Reports

**Subscribe to Nieman Reports**

# Subscribe to Nieman Reports

## Newsletter

Subscribe to Nieman Reports monthly newsletter!

**Subscribe here**

You can also keep up with Nieman Reports on Twitter, Facebook and Flipboard.

## Print Subscription

Prefer the print version of Nieman Reports? The cost of subscribing to the quarterly magazine is:

| | |
|---|---|
| U.S., Canada and Mexico – One Year | $ 25.00 |
| U.S., Canada and Mexico – Two Years | $ 40.00 |
| Overseas – One Year | $ 35.00 |
| Overseas – Two Years | $ 60.00 |

Choose among the following options to subscribe:

- Subscribe online
- Download and print the subscription form

Choose among the following options to subscribe:

- Subscribe online
- Download and print the subscription form

*Mail the completed form and check to:*

Nieman Reports Subscriptions
Nieman Foundation for Journalism at Harvard
One Francis Avenue
Cambridge, MA 02138
USA

Back Issues

Depending on the availability of each issue, back issues may be purchased at a cost of $7.50 (domestic) or $10 (international) each, shipping included. Please email nreports@harvard.edu to confirm the availability of specific titles before sending payment.

We do not accept credit card payments for back issues, only checks. We accept credit card or check payments for subscriptions. Checks should be made to "Nieman Reports," then mailed to

Nieman Reports Subscriptions
One Francis Avenue
Cambridge, MA 02138

Subscriptions and back issue purchases are nonrefundable.

**Nieman**Reports

CONTACT US   SUBSCRIBE   TWITTER   FACEBOOK

Help advance the Nieman Foundation's mission "to promote and elevate the standards of journalism" by making a donation.

**Nieman**

To promote and elevate the standards of journalism

**Nieman**Reports

Covering thought leadership in journalism

**Nieman**Lab

Pushing to the future of journalism

**Nieman**Storyboard

Exploring the art and craft of story

Nieman Foundation for Journalism at Harvard     Walter Lippmann House     One Francis Ave. Cambridge, MA 02138     617 495 2237

© 2020 by the President and Fellows of Harvard College

Harvard   Trademark   Privacy   Digital Accessibility

Document title: Subscribe to Nieman Reports - Nieman Reports
Capture URL: https://niemanreports.org/about-nieman-reports/subscribe-to-nieman-reports/
Capture timestamp (UTC): Wed, 29 Jul 2020 14:58:16 GMT